PATTERSON, INGRAHAM and LAUGHLIN, JJ., concurred;
VAN BRUNT, P. J., dissented.

Judgment affirmed.

# Court of Appeals.

February 16, 1904.

## THE PEOPLE v. WILLIAM RODAWALD.

(177 N. Y. 408.)

1. MURDER—SUFFICIENCY OF EVIDENCE.

   The evidence upon the trial of an indictment for homicide ex-
   amined and held sufficient to warrant a verdict convicting the
   defendant of the crime of murder in the first degree.

2. EVIDENCE.

   Where the occurrence, which resulted in the homicide, was a dis-
   pute between the defendant and a third party as to the ownership

of certain posts which such party asserted had been given her by the section foreman of the railroad corporation owning them, and which the defendant attempted to remove, the testimony of the foreman that he gave the posts to her, although he had no authority to do so, is competent as proof that her claim had some foundation and as part of the history of the case.

**3. IMPROPER HYPOTHETICAL QUESTION.**

A question as to what a witness would have done with respect to taking the deceased into her family had she known that he had been in state prison is improper because hypothetical and as calling for an opinion upon a subject to which opinion evidence does not apply.

**4. EVIDENCE OF GENERAL REPUTATION OF DECEASED, HOWEVER BAD, IMMATERIAL UPON THE ISSUE OF SELF-DEFENSE.**

Certified copies of judgment records offered in evidence by the defendant to show that the deceased had been convicted of petit larceny and of assault in the first degree, and a letter written by him to an acquaintance referring to his criminal record, where there is no proof in the case that the defendant had heard of the convictions, and although he knew that the deceased had been in state prison he did not know the nature of his offense, are properly excluded, 1, because the defendant knew nothing about the previous convictions or about the nature of the offenses ; 2, because the offer was not to prove the general reputation of the deceased for violence, but to show specific acts of which he had been guilty, not towards the defendant or to his knowledge, but towards third persons or their property. Where a homicide is attempted to be justified upon the ground that it was committed in self-defense, the general reputation of the deceased for violence may be shown, and if there is proof that the defendant had knowledge of it, it is competent to show that he had reason to apprehend danger, but it cannot be established by proof of specific acts ; proof of his general reputation merely, however bad, can have no bearing upon the issue and is immaterial.

**5. JUDGMENT RECORD OF CONVICTION NOT CONCLUSIVE.**

A judgment record in a criminal case is not conclusive and may be contradicted when the question arises collaterally.

**6. REFUSAL TO CHARGE AS TO ISSUE OF SELF-DEFENSE.**

The refusal of the trial court to charge that if the defendant honestly believed himself to be in danger of great bodily harm from the deceased and in firing the shot he acted upon that belief, he was excusable whether such danger actually existed or not, is not

erroneous because there must not only be reasonable ground to ap-
prehend a design on the part of the person slain to do some great
personal injury to the slayer, but there must also be imminent
danger of such design being accomplished and the requested in-
struction was silent as to the latter requirement.

**7. GENERALITY OF CHARGE NO GROUND FOR REVERSAL.**

The fact that the charge of the trial court, to which no exception
was taken, so far as it related to self-defense, consisted mainly of
certain sections read from the Penal Code and was so general that
the jury may not have understood it, while rendering the charge
subject to criticism, does not present reversible error. Counsel
should have requested further instructions, and if refused he could
have been protected by an exception.

APPEAL from a judgment of the Supreme Court, rendered
June 20, 1903, at a Trial Term for the county of Cattarau-
gus, upon a verdict convicting the defendant of the crime of
murder in the first degree.

The facts, so far as material, are stated in the opinion.

Thomas H. Dowd for appellant.    The court erred in per-
mitting the witness Greenberg to testify to a pretended gift
of the posts in question to Mrs. Keating, and in refusing to
strike out this evidence after it had affirmatively appeared
that he neither owned the posts nor had any authority from
the owner to give them away.    (People v. Corey, 148 N. Y.
476; Anderson v. R., W. & O. R. R. Co., 54 N. Y. 334;
Hutchins v. Hutchins, 98 N. Y. 56; People v. Greenwald,
108 N. Y. 296.)    The court was in error in sustaining the
objections made by the district attorney to the questions
asked the witness Keating.    (Newcomb v. Griswold, 24 N.
Y. 298; Real v. People, 42 N. Y. 270; 1 Greenl. on Ev.
[15th ed.] 603, 604.)    The court erred in excluding the

record of conviction of deceased in Cattaraugus county, and also excluding exhibits tending to show the criminal record of deceased. (People v. Druse, 103 N. Y. 655 ; People v. Harris, 95 Mich. 87; Root v. King, 7 Cow. 613; People v. Corey, 157 N. Y. 341.) The defendant is entitled to a new trial on account of the insufficiency of the charge to the jury and the refusal of the court to charge as requested. (People v. Corey, 148 N. Y. 476 ; Code Civ. Pro. § 528; People v. Leonardi, 143 N. Y. 360; People v. Barberi, 149 N. Y. 256.)

George W. Cole, District Attorney, for respondent. If the verdict is fairly supported by the evidence it should not be interfered with. (People v. Kelly, 113 N. Y. 647; People v: Hoch, 150 N. Y. 291; People v. Sliney, 137 N. Y. 570; People v. Conroy, 153 N. Y. 174; People v. Gaimari, 176 N. Y. 84; People v. Schmidt, 168 N. Y. 568.) The proof of premeditation and deliberation was abundant and convincing. (People v. Clark, 7 N. Y. 393; People v. Ferraro, 161 N. Y. 365; People v. Schmidt, 168 N. Y. 568 ; People v. Majone, 91 N. Y. 211.) No error was committed in excluding the defendant's offer to prove that the deceased had been convicted of crime. (People v. Lamb, 2 Keyes, 360; Marts v. State, 26 Ohio, 162; People v. Druse, 103 N. Y. 655; Nichols v. People, 23 Hun, 165; State v. Turpin, 77 N. C. 473; Dukes v. State, 11 Ind. 557; State v. Rollins, 113 N. C. 722, People v. Stokes, 53 N. Y. 164; Keener v. State, 18 Ga. 194.) There was no error in excluding the records of conviction of the deceased. (Underhill on Cr. Ev. § 325; 2 Bishop's New Cr. Pro. § 617; Thomas v. People, 67 N. Y. 218; Eggler v. People, 56 N. Y. 642; People v. Druse, 103 N. Y. 655; People v. Lamb, 2 Keyes, 360; McKenna v. People, 18 Hun, 581; Nichols v. People, 23 Hun, 165; People v. Gaimari, 176 N. Y. 84; Dupree v. State, 33 Ala. 380; State v. Pefferr, 80 Iowa, 580; Alexander v. Commonwealth, 105 La. 1; Garner v. State, 28 Fla. 113; State v.

Elkins, 63 Mo. 159.)   There was no error in the refusals to charge as requested.   (1 McClain on Cr. Law, § 306; People v. Austin, 1 Park. Cr. Rep. 154; People v. Cole, 4 Park. Cr. Rep. 35; People v. Lamb, 2 Keyes, 360; People v. Johnson, 139 N. Y. 358; People v. Kennedy, 159 N. Y. 346; People v. Gaimari, 176 N. Y. 84; Shorter v. People, 2 N. Y. 193.)   The charge of the court was eminently fair, and no criticism was made upon it at the time.   (People v. Decker, 157 N. Y. 186; People v. McDonald, 159 N. Y. 309; People v. Rice, 159 N. Y. 400; People v. Sigouras, 163 N. Y. 250; People v. Ennis, 176 N. Y. 289.)

VANN, J.

The homicide which is the subject of this appeal was committed in April, 1903.   The defendant was indicted in May, convicted in June and appealed to this court in July of the same year.   The appeal was argued in January, 1904.

In the outskirts of the village of West Salamanca, Cattaraugus county, there is a public highway known as South street, running from Broad street on the south bank of the Allegheny river southerly to the Pennsylvania railroad, a distance of 1,070 feet.   On that street the homicide in question occurred and on that street the deceased, the accused and all the witnesses of the tragedy resided.   On the west side, about two hundred feet north of the railroad, the defendant lived with his family, consisting of his wife and three children, Mary, Robert and William, aged, respectively, 15, 13 and 12 years.   Mrs. Keating, a widow with six children, ranging in age from three to thirteen years, resided on the east side of the street, about 700 feet south of Broad street.   Davis, a colored man, and his wife also lived on the east side of the street, a few feet south of Mrs. Keat-

ing and nearly opposite the defendant. No one else lived on that street or within a thousand feet of the scene of the homicide.

The defendant was born in Germany, and at the time of the fatal event was 49 years of age and had lived in this country since 1889. He was in the German army for three years and had worked as a bricklayer in Germany and as a laborer in this country. A short time before he left Germany he was arrested for fighting during a strike and after a trial was imprisoned for nine months. After coming to this country he was arrested upon a peace warrant, but gave bail and was discharged. He was a temperate, industrious man, and was never charged with any other crime until the present accusation was brought against him. About 1887, during a strike in the brickyard where he was employed, he was struck on the head with a spade and so seriously injured that he could not work at any employment which required him to bend over. For a while after that he sometimes fainted, on other occasions grew dizzy, and ever since he has been troubled with sick headache occasionally, oftener in warm weather than in cold. Except as stated, his health was good. He was somewhat excitable, and, under excitement, spoke and acted in a strange way.

The deceased, Jesse Frederick Bayer, was born in Amsterdam, N. Y., and was about 25 years old at the time of his death. He does not appear to have had a fixed place of abode for long at a time. He had been a circus performer, and he lived on the Indian reservation in Cattaraugus county for a while prior to the spring of 1902, when he enlisted in the United States navy. Why he was discharged does not appear, but in less than a year he returned to the reservation, and eight days before his death began to board with Mrs. Keating. During this period he worked in a bicycle factory in Salamanca, a little more than a mile from his boarding house. These two men had never met, but the

defendant knew who Bayer was and that he had been in state's prison.

For several years prior to the homicide the defendant had been accustomed to get from the side of the railroad old posts and ties to use as fuel, and he claimed that this privilege had been given him by the section boss. Mrs. Keating also claimed the same privilege by permission from the same person, but he had no right to give the material away. On the day before the homicide Mrs. Keating had drawn one load of old fence posts to her premises, and with the help of her little boy had piled up some more on the south side of the track in the vicinity of the South street crossing, intending to draw them at her convenience. On the day of the homicide Mrs. Rodawald had taken away some of the posts, but the defendant did not know it.

At this time the defendant was working in a tannery at Salamanca, more than a mile from where he resided. On the 7th of April, 1903, after working during the day as usual, he stopped at ten minutes of six and reached home between half-past six and a quarter of seven. He at once put down his dinner pail, threw off his coat, called his two boys to bring the wheelbarrow, and started to get some posts, there being but four left at that time. They loaded the posts on the barrow, wheeled them to the crossing, where it was necessary to unload in order to get over the rails, and the defendant, taking one of the posts on his shoulder, started for his house, On his way he passed by Davis, who was working in his garden. Davis said to him, "You are getting some wood," and the defendant answered, "Yes, I am getting some wood. Why don't you go and get some?" Davis replied, "I don't want any. That widow says it is her wood, and I don't want any of it." The defendant said, "It is just as much yours as it is hers. Why don't you go and get some?" But Davis said he wouldn't get any. Mrs. Keating saw him carrying the post

and called to him, saying, "Mr. Rodawald, I wish you would please leave that wood alone. It was given to me." He shouted, "To hell mit you, anybody can take this wood." As she stepped back into her house, Bayer came out and went up to the railroad, where the rest of the posts were. Davis came out in the road and said, "I wouldn't take her wood, she is a poor woman. I wouldn't take her wood," but the defendant did not stop.

After throwing down the fence post by his wood pile, he returned to the little boys, who in the meantime had run the wheelbarrow across the railroad tracks. Two of the posts were again loaded, the defendant took the third and carried it to his house. The boys wheeled the loaded barrow a short distance and stopped in a vacant lot a few feet west of the street and about 125 feet from the defendant's house. At about this time Bayer said to the defendant, "Now, Mister, you oughn't to take that wood from that woman. She is a widow woman and you are a man, and you can get wood better than she can." Shaking his fist, the defendant said, "To hell mit you ; to hell mit you ; go on mit you. Anybody can take this wood." On his way back to the wheelbarrow, after he had thrown the second post on the woodpile, the defendant saw Bayer throw the remaining posts off on the ground and shouting to his wife said, "Go get my gun, get my revolver," but she did not go. He also said, "Shoot 'em, kill 'em," and was "shaking mad and swearing." He ran into his house by the back door and came out with a revolver and a double-barreled shot gun. The revolver, of 32-caliber, could be cocked and discharged by a single pull on the trigger. It contained five ball cartridges and both barrels of the shot gun were loaded, but it does not appear that the hammer of either barrel was cocked. As he came out of his house he held the gun "up in the attitude of shooting." Mrs. Keating shouted to Bayer, "Come away, Jesse, if you don't he will shoot you."

Davis said to the defendant, "Put down that gun, you are not going to shoot nobody here, there is nobody done anything to you, you put it down." The defendant said, "I will shoot 'em all. I will kill 'em," and kept on going fast toward Bayer, who had gone from the wheelbarrow into the street and was advancing rapidly toward the defendant. As the defendant spoke he lowered his gun, shifted it to his left hand, drew the revolver from his hip pocket and said, as one of the witnesses stated, "I will shoot you, you son of a ——." Bayer threw up both hands and said, "Don't shoot. Please don't shoot," but the defendant fired at close range, Bayer staggered back two or three steps from the highway, fell to the ground and died "without a word or a groan." As the revolver went off Bayer "ducked his head." The place where he fell was 17 feet from the nearest part of the foundation of an old building that had been burned, 25 feet from the wheelbarrow and 101 feet from the front door of the defendant's house. Davis rushed up and said to the defendant, "You have killed this man," and called him a cowardly murderer. The defendant walked around the head of the deceased and said, according to the statement of one witness, "If he no dead, me shoot him again." No other witness mentioned this fact. The defendant gave the shot gun to one of his sons, wheeled the two posts to his house, put away his revolver, put on his coat and started for Salamanca. On his way he said to some witnesses for the prosecution that they need not arrest him for he was going to arrest himself. He went to the office of a deputy sheriff, told him that he had shot a man, and, in response to questions, said that the man was dead ; that he shot him in the shoulder and that he did not see him have a weapon of any kind or a knife. When asked what he shot him for, he said that it was over some wood that he got from the railroad company ; that Bayer had pushed his wife away from the wheelbarrow and shoved his little boys around, and that a

man who would not take care of his wife and children was not much of a man. He was excited, spoke fast and in broken English.

These are the facts as the jury might have found them from the testimony of Mrs. Keating and her daughter Pearl, eleven years old, Mr. and Mrs. Davis and the deputy sheriff, all of whom were called by the People, and all except the officer saw the homicide. They did not all testify to all of these facts, as some apparently observed acts that escaped the attention of others. There was some difference in their statements, especially in regard to what was said and when it was said, but as to what was done at the critical moment they were in substantial accord. The evidence showed traces of ill-feeling between the Keating and Davis families on the one hand and the family of the defendant on the other.

The surgeon who made the autopsy reached the body at about half-past seven. He found the height of the dead man from measurement to be five feet eight inches, and estimated the weight at 135 pounds. The bullet entered the left temple at a point an inch and a half in front of the ear and half an inch higher than the ear. The course of the wound was "backward, downward and inward toward the middle line of the brain." The bullet penetrated four and a half inches, and went half an inch downward in going that distance.

The eye-witnesses of the homicide who were called by the defendant were himself, his wife and the three children who lived at home. According to their version, the defendant, calling to the boys, told them to get the wheelbarrow, saying that he wanted some posts to make a calf pasture. While he was carrying one of the posts to the house, Bayer asked him if the section boss gave him those posts, and the defendant said, "Yes," when Bayer remarked, "All right, you can have them." Davis came out to the road and said,

"That wood ain't yours," and the defendant replied, "I have got it so far and I can have it now." Later, Bayer threw the rest of the posts off of the wheelbarrow and Mrs. Rodawald tried to put them on again, when he caught her by the dress and shoved her, pushed the boys away and ran the wheelbarrow against one of them. One of the boys denied that the defendant told his wife to go for the gun, but his other witnesses said he did, after first telling Bayer that if he did not go away he would get his gun. When the defendant came out of his house with the gun and went toward Bayer, he said to him that if he did not go away from there he would shoot him, and Bayer then left the wheelbarrow and walked toward . Davis' house. Thereupon the defendant turned around and said, partly in German and partly in English : "Come in the house and let the wood go to hell." As he said this he started toward his house, and Bayer, who was twelve or fifteen feet away, with three fingers drew a knife from a pocket situated like a watch pocket in the front part of the pantaloons he had worn in the navy, opened it and holding it in his right hand ran up behind the defendant, caught him by the back of the collar with his left hand and raised the knife over his head. The defendant dropped his gun and with his right hand seized Bayer by the right hand, the revolver went off and Bayer staggered, threw his hands in the air and fell over backward. The defendant did not say that if Bayer was not dead he would shoot him again. He told his son Robert to take the gun in the house, piled the posts on the wheelbarrow and wheeled it home. Two of these witnesses swore that when the defendant started for his gun Bayer had not taken hold of Mrs. Rodawald, but several of them said that after the defendant came out with the gun Bayer caught hold of her. Although they all saw the knife in Bayer's hands as he ran up behind the defendant, none of them warned him. The defendant, however, swore that he heard

the children scream and turning partly around saw Bayer holding the knife up high in readiness to strike. The defendant also testified that when he dropped his gun and seized Bayer he had the revolver in the same hand with which he caught hold of Bayer's hand and that in the struggle the revolver went off by accident. He did not intend to shoot any one when he went for his gun or at any time. He went for the gun because Mrs. Keating had a butcher knife and shouted, "Kill the sons of bitches," and he wanted to scare them away. He thought Bayer was going to strike him with the knife when he caught him by the hand. There was evidence that Mrs. Keating had a butcher knife and Davis a revolver when they were in the vicinity of the wheelbarrow before the defendant went for his gun, but no attempt was made to use either, although Mrs. Keating said, "Kill the sons of bitches" and repeated it.

The members of defendant's family did not look for the knife after all was over, but two days later his sons were playing ball, and, as they testified, found a knife in some dead grass by one of the stones in the foundation of the burned building, about 17 feet from where Bayer fell. It was a clasp-knife, with the blade open and was bright and free from rust, although rain had fallen several times since the homicide, and the knife had been exposed to dampness for more than forty hours. One of the boys testified that Bayer had no coat on or anything that covered the pocket from which he took the knife, but the surgeon who made the autopsy, as well as the coroner who promptly viewed the body, said that it had a sweater on which came down over all the pockets. The defendant swore that when he surrendered himself he told the officer that the man he shot came up behind him with a knife. Members of the defendant's family were examined by the district attorney with the aid of a stenographer the day after the homicide, and while some of the statements made were inconsistent with

their statements on the trial, still it was then said that Bayer had a knife, drew it, jumped and caught the defendant by the collar and had hold of him when the revolver went off. The knife was found on the afternoon of the day when the defendant was examined before a magistrate in the forenoon.

Mrs. Keating and her daughter on their redirect examination denied that the former had a butcher knife or any knife, or that she said what was attributed to her about killing. They never saw Bayer have a knife and he did not have one in his hand that night and run up behind the defendant. Mr. and Mrs. Davis testified to the same effect and said that Davis had no revolver and had not owned one for over eighteen years.

Three witnesses swore that the defendant showed great excitement while a witness at a trial in Elmira, in November, 1902, raising himself up from the chair and saying several times to the attorney, who was sharply cross-examining him upon the subject of his arrest in Germany, "Who told you that? That's a lie," with variations. An officer by order of the court forced him to keep seated in his chair. These acts impressed those witnesses, who had never seen him before, as irrational. One of them, however, testified that the answers of the defendant, when separated from his actions, were not irrational, and other testimony was given to the same effect. The same acts impressed a physician, who observed them carefully through curiosity, as rational. A married daughter of the defendant testified that after he was struck on the head with a spade in Germany he was more excitable, more irritable and less kind to the members of his family than before. No expert upon the subject of insanity was called by either side.

We have thus stated the leading facts as fully as space will permit. It is clear that the evidence presented a grave question of fact, depending to an unusual extent upon the

credibility of witnesses and requiring the judgment of a jury for its determination. No court is wise enough to decide who told the truth without seeing the witnesses. According to the evidence for the prosecution, although the actors in the tragedy were strangers, the defendant was the aggressor from the outset, acting with deliberation and without reasonable provocation. According to the evidence for the defendant, although he may have armed himself without adequate cause, he had given up the controversy over the wood and had started for home when he was attacked by the deceased with a dangerous weapon and the revolver was fired in lawful defense of his person, or went off accidentally. A fearful mistake may have been made by the jury, yet justice cannot be administered without running that risk in almost every murder case that is tried.

The downward course of the bullet after it went through the skull may have been owing to mechanical deflection, or it may have been in the line of origin. If the former was the cause, the fact is without significance, and if the latter, it could be accounted for by the theory of either side. The ground on which the parties stood was level. If the deceased "ducked his head" as the revolver went off, or if the defendant with the revolver in his hand seized the hand of the deceased as it was held aloft in readiness to strike, the course of the bullet may have been straight from the muzzle of the revolver to the center of the brain.

The story about finding the knife so long after the death and so far from where the dead man fell, in view of its condition when found after prolonged exposure to dampness, seems improbable, yet members of the defendant's family on the day after the homicide, without consulting counsel or talking with the defendant, so far as appears, or with any one except a relative who called, told the district attorney that the deceased drew a knife and was in the act of attacking when he was shot. The deputy sheriff, apparently a

fair and disinterested witness, said that defendant told him within an hour after the occurrence that the deceased had no knife, but the defendant swore directly the reverse.

The use of a self-cocking revolver gives some support to the claim, either that the killing was accidental or that the defendant acted without deliberation, but if he shifted the shotgun to his left hand and with his right drew the revolver from a pocket behind and fired at the deceased, it warrants the inference of deliberation and premeditation.

If the deceased was running toward the defendant when he was shot, as the People claim, it may indicate an intention to seize and disarm, as Rodawald was then facing Bayer and advancing towards him with his gun up in readiness to shoot, but it does not support the theory of the defense that Bayer ran up from behind. It bears, however, upon the question of deliberation.

The prompt surrender of the defendant to an officer of justice is a circumstance in his favor, but it also indicates that his mind was clear and that he was controlled by reason and judgment.

There are no controlling circumstances to guide us through the labyrinth of contradiction. If a reasonable doubt existed as to the defendant's guilt, or as to the degree of his guilt, it was for the jury to find it. Even if we should reach a different conclusion, we must accept their verdict as rendered, for the Constitution and the law makes their judgment supreme under such circumstances. (People v. Kelly, 113 N. Y. 647; People v. Hoch, 150 N. Y. 291.)

Four questions of law are presented for our consideration.

1. The defendant claims that the trial justice erred in allowing the section foreman of the Pennsylvania railroad to testify, under objection and exception, that he gave the posts which were the cause of the trouble to Mrs. Keating, although he had no authority to give them away, as his orders were to burn them. Both the defendant and Mrs.

Keating claimed the posts, but apparently neither had any right to them. As Mrs. Keating did not know that her title was defective, it was proper to show that her claim had some foundation and that she was not stealing the property but acting in good faith. She told the defendant that the posts belonged to her, and the People had the right to prove that an employee of the railroad company, in charge of the section from which they were taken, had assumed to give them to her. This was part of the history of the case and threw some light on the conduct of the parties who claimed the wood.

2. During the cross-examination of Mrs. Keating an effort was made by counsel for the defendant to show that Bayer told her that he had been in prison. Among orher questions the following was asked, " Did he (Bayer) at any time afterward, and during his lifetime and before his death, had he ever told you that he had been in prison ?" Soon after this question had been answered, the witness was asked, "Would it have made any difference with your taking him in your family had you known he had served a term in state's prison for robbery ?" The court sustained the objection of the district attorney, and the defendant excepted.

The question was improper, because it was hypothetical and called for an opinion upon a subject to which evidence by opinion does not apply. If the real object was to discredit or impeach, the question should have called for a fact, not an opinion. Any act or experience of the witness which reflected upon her character could, in the sound discretion of the court, be shown on her cross-examination, but what she thought she would do upon a state of facts not proved, was clearly immaterial for any purpose.

3. The defendant offered in evidence certified copies of the following records :

A judgment rendered by a Court of Special Sessions

held in Montgomery county on the 14th of January, 1889, convicting the deceased of petit larceny upon his plea of guilty, and sentencing him to the State Industrial School at the city of Rochester.

A judgment of the County Court of Cattaraugus county, convicting the deceased, also upon a plea of guilty, of assault in the first degree, and sentencing him to imprisonment in state prison for four years.

The defendant also offered in evidence a letter written by the deceased, dated Norfolk, Va., June 19th, 1902, in which he asked an acquaintance to aid in freeing him from his enlistment in the United States navy, upon the ground that he was an ex-convict, and closing as follows : "Auburn record is four years for assault, 14 months for burglary. Also to Albany for U. S. offense ; also State I. School you will know how to work it I guess now do this as a favor."

No offer was made to show that the defendant had heard that the deceased had been convicted of any of these offenses. All this evidence was excluded upon the objection that it was not the proper method of proving the character of the deceased ; that specific acts are incompetent, and that the proof should be limited to general reputation. An exception was taken to each ruling as it was made.

The defendant was allowed to show without objection that the deceased had been in state prison, and that his wife told him so, but no effort was made to prove that the nature of the offense for which he was thus punished was brought to the knowledge of the defendant. So far as he knew the imprisonment might have been for bigamy, forgery, or some crime not involving violence.

The general character of the deceased was immaterial, for the worst man has the right to live the same as the best, and no one may attack another because his general reputation is bad. The law protects every one from unlawful violence, regardless of his character. Upon a trial for murder,

however, the accused, after giving evidence tending to show that he acted in self-defense, may prove that the general reputation of the deceased was that of a quarrelsome, vindictive or violent man and that such reputation had come to his knowledge prior to the homicide. (People v. Gaimari, 176 N. Y. 84, 95; People v. Lamb, 2 Keyes, 360, 366; Abbott v. People, 86 N. Y. 460; Eggler v. People, 56 N. Y. 642; Wharton's Criminal Law [2d ed.], § 606; Wharton's Criminal Evidence [9th ed.] §, 69; Underhill's Criminal Evidence, § 324.)

Such evidence is not received to show that the deceased was the aggressor, for if competent for that purpose, similar evidence could be given as to the reputation of the defendant as bearing on the probability that he was the aggressor. It is competent "only in cases where the killing took place under circumstances that afforded the slayer reasonable grounds to believe himself in peril, and then solely for the purpose of illustrating to the jury the motive which actuated him." (People v. Lamb, supra, p. 376.) Fear founded on fact tends to rebut the presumption of malice. The character of the deceased with reference to violence, when known to the accused, enables him to judge of the danger and aids the jury in deciding whether he acted in good faith and upon the honest belief that his life was in peril. It shows the state of his mind as to the necessity of defending himself. It bears upon the question whether, in the language of the Penal Code, "there is reasonable ground to apprehend a design on the part of the person slain * * * to do some great personal injury to the slayer * * * and there is imminent danger of such design being accomplished." (§ 205.) When self-defense is an issue, threats of the deceased, even if unknown to the defendant, are admissible, as they tend to show the state of mind to the deceased and that he was the aggressor. (Stokes v. People, 53 N. Y. 164, 174; People v. Taylor, 177 N. Y. 237.) Evidence of gen-

eral reputation for violence, however, is received, **not to** show the state of mind of the deceased, but of the accused ; not to show who was in fact the aggressor, but whether the defendant had reasonable ground to believe that he was in danger of great personal injury.    Hence, it is obvious that whatever the reputation of the deceased for violence may be, it can have no bearing on what the defendant apprehended, unless he knew it.    If he knew that the deceased was reputed to be violent, it might raise in his mind a fear of danger; but not otherwise.    We think the evidence of previous convictions was incompetent, because the defendant knew nothing about them, or about the nature of the offenses, so far as appears.

The evidence, moreover, was incompetent for another reason.    The offer was not to prove the general reputation of the deceased for violence, but to show specific acts of which he had been guilty, not toward the defendant, or to his knowledge, but toward third persons, or their property. The rule is well settled that this is improper, not only because character is never established by proof of individual acts, but because each specific act shown would create a new issue.    (People v. Gaimari, 176 N. Y. 84, 95; People v. Druse, 103 N. Y. 655; Thomas v. People, 67 N. Y. 218, 225 ; Eggler v. People, 56 N. Y. 642; People v. Lamb, 2 Keyes, 360, 366.)

Eggler v. People is not fully reported, but we make the following extract from the statement of the reporter : " After general evidence had been given on behalf of the prisoner, tending to show that the deceased was disposed to be sullen and violent in temper when angry, and that when excited she was ungovernable and passionate, questions were asked tending to show particular instances of exhibitions of temper.    These were excluded, under objection. Held, no error."

In Thomas v. People, Judge Earl, writing for the court,

said : "Upon the trial the prisoner was permitted to prove threats and acts of violence toward himself by the deceased, and also to prove that the general character of the deceased was bad ; that he was very quarrelsome and vindictive. He offered to prove, also, that before he came to the prison the deceased was engaged in several fights with other parties, in each of which he used a knife and cut his opponent ; also his declarations about cutting people with razors, and that all these matters had been communicated to the prisoner. These offers were overruled and this is now complained of as error. Even if the proof given of the general character of the deceased was competent upon the facts of this case, there is no authority for holding that proof of specific acts of violence upon other persons. no part of the res gestæ, and in no way connected with the prisoner, was competent."

In People v. Druse, Andrews, speaking for all the judges, said : "The rule is that after evidence has been given by a defendant, tending to show that the homicide was committed in self-defense, he may follow it by proof of the general reputation of the deceased for quarrelsomeness and violence. But a defendant is confined to proof of general reputation, and evidence of specific acts of violence toward third persons is inadmissible."

The defendant insists that a judgment record imports absolute verity and that it cannot give rise to a new issue because it cannot be contradicted. When, however, the question arises collaterally, the record of a judgment in a criminal case is not conclusive. In Sims v. Sims (75 N. Y. 466) the defendant testified as a witness in his own behalf, and a record of his conviction in the state of Ohio for a felony was offered by the plaintiff and received in evidence for the purpose of impeaching him. He was thereupon asked by his counsel whether he was guilty of the offense of which he had been convicted, but the question was objected to and

excluded.   It was held that the ruling was erroneous and
the judgment was reversed.

4. At the close of the charge, to which no exception was
taken, counsel for the defendant said that while he recogniz-
ed "the exceeding fairness and impartiality" of the charge,
he wished to present two requests, one of which was charg-
ed and the other, with the action of the court thereon, was
as follows :   "I ask your honor to charge the jury that if at
the time of the commission of the act charged in the indict-
ment, if in this case at the time that Rodawald actually shot
the revolver, the defendant honestly believed himself to be
in danger of great bodily harm from the deceased, from the
man killed and in firing the shot charged in the indictment
the defendant acted upon that belief, then the defendant is
excusable, whether in fact such danger actually existed or
not."   The court declined to charge "in that form," and
remarked :   "I leave my charge as I have made it on that
subject."   The defendant excepted.

In the body of the charge the court said :   "Homicide is
excusable when committed by accident and misfortune, in
lawfully correcting a child or a servant or in doing any other
lawful act by lawful means, with ordinary caution and with-
out any unlawful intent.   Homicide is also justifiable when
committed either in the lawful defense of the slayer or of his
or her husband, wife, parent, child, brother, sister, master
or servant or of any other person in his presence or com-
pany when there is reasonable ground to apprehend a design
on the part of the person slain to commit a felony or to do
some great personal injury to the slayer or to any such per-
son, and there is imminent danger of such design being
accomplished, or in the actual resistance of the attempt to
commit a felony upon the slayer in his presence or upon or
in a dwelling or other place of abode in which he is.   There
is a further provision of law as follows :   An act otherwise
criminal is justifiable when it is done to protect the person

committing it or another whom he is bound to protect from inevitable and irreparable personal injury and the injury could only be prevented by the act, nothing more being done than is necessary to prevent the injury. * * * As regards the question of self-defense, I think I can render you no better service, and certainly can state it no clearer by any words of my own, than the words which are used in the Court of Appeals, where this question is referred to. It is said : ' Before a party can justify the taking of life in self-defense, he must show that there was reasonable grounds for believing he was in great peril ; that the killing was necessary for his escape, and that no other safe means was open to him. When one believes himself about to be attacked by another and to receive great bodily injury, it is his duty to avoid the attack if in his power to do so, and the right of attack for the purpose of self-defense does not arise until he has done every thing in his power to avoid its necessity.' * * * It is contended at least that Bayer did attack Rodawald with the knife while Rodawald was on his way home, with his back turned, and that Rodawald grabbed Bayer's arm with one of his hands, and that he dropped the gun and took the revolver, and in some way that was discharged and Bayer was killed. It is contended on the part of Rodawald that he did not intend to shoot ; that it was a mere accident, or at all events that, if it was not that, that he did no more than was necessary to protect his own life, and it was absolutely necessary to protect him from great bodily harm ; and that what he did there he was justified in doing as a matter of self-defense, and his counsel urges that under the law as it is in this state he had the right to do what he did. I have read the law in your hearing."

The law does not justify homicide upon the theory of self-defense, so far as it is applicable to this case, unless two facts exist : 1. There must be reasonable ground to appre-

hend a design on the part of the person slain to do some great personal injury to the slayer. 2. There must be imminent danger of such design being accomplished. The question is not merely what did the accused believe, but also, what did he have the right to believe? Whatever may be said as to the sufficiency of the request so far as the first requirement is concerned, there was no attempt to comply with the second. The element of imminent danger that the design would be accomplished was wholly wanting, and hence the exception raises no error. (Penal Code, § 205.)

The defendant's counsel further urges that so far as the charge related to self-defense, a subject of vital importance to his client, it consisted mainly of certain sections read from the Penal Code, and was so general that the jury may not have clearly understood it. There is some force in this criticism, for a statute framed to cover all cases may produce confusion where it is all read to the jury with no explanation, instead of the part only that applies to the case in hand, but no reversible error is presented. The counsel should have requested further instructions, which would doubtless have been given, or if they had been refused, he could have been protected by an exception. As we have recently said : " Only errors raised by exception require a new trial, and it is only when we are satisfied that the verdict was against the weight of evidence, or against law, or that justice requires a new trial, that we are permitted to reverse whether an exception shall have been taken or not in the court below." (People v. Tobin, 176 N. Y. 278, 288.)

A new trial should not be granted without substantial reasons, for a loose administration of the law against murder tends to cheapen human life.

The judgment of conviction should be affirmed.

O'BRIEN, J. (dissenting). The homicide of which the defendant was convicted was concededly the result of a

quarrel between him and the deceased. The subject-matter of the quarrel was some old fence posts on the line of the railroad in the vicinity of which the parties lived. These posts were of no value except for firewood. The defendant claimed that they were given to him by some of the railroad officials, while a Mrs. Keating claimed they belonged to her for the same reason. The deceased had no interest whatever in the controversy, but he lived with Mrs. Keating and became in some sense the champion of her cause. The vital question in the case is upon the facts concerning the actions of the deceased and the defendant at the moment of the tragedy. The witnesses on either side did not possess a very high grade of intelligence. The defendant, his wife and children testified, in substance, that at the moment when the fatal shot was fired the deceased was advancing toward the defendant in a hostile attitude with a knife in his uplifted hand. On the part of the People the witnesses were the friends and associates of the deceased and they testified, substantially, that he had no knife and made no hostile demonstrations toward the defendant. It is certain that a knife was found a day or two after the tragedy in the vicinity of the place where the killing occurred. It was claimed on the part of the People that this knife was placed there after the transaction for the purpose of furnishing evidence in the defendant's behalf. It is quite clear that the defendant himself had no opportunity to place it there, nor had he any opportunity to confer directly with his wife or children, so the People's theory must be that some of the children or the wife must have had the gift of foresight to such an extent that they placed the knife where it was found for the purpose of building upon that fact a theory for the defense of the accused. It is not absolutely impossible that that theory may be true, but considering all the facts and circumstances of the case, and especially the age of the children, and their general intelligence, as well as that

of their mother, it is difficult to believe.    But the important
fact is that there was a sharp conflict of evidence in the case
as to what actually took place at the time of the homicide.
On the one side, it is claimed that the defendant shot the
deceased with deliberation and premeditation, without any
cause and without any reason to fear any assault upon him-
self, although the deceased and the defendant, so far as it
appears, never had any quarrel before and no animosity
existed between them.    On the other hand, the claim is
that the defendant fired the fatal shot when he saw the
deceased advancing towards him with a knife in his uplifted
hand and under the fear and apprehension that his own life
was imperiled.    It is important, therefore, that every right
secured to the defendant was awarded to him upon the trial,
and if there is any error in the rulings or decisions at the
trial then clearly the judgment ought to be reversed.

I think there was such error, and it will be necessary to
refer to the charge of the learned trial judge or rather to
what took place after the charge.    The defendant's counsel,
at the close of all the proceedings, including the charge,
requested the court to charge as follows :    " I ask your hon-
or to charge the jury that if at the time of the commission
of the act charged in the indictment, if in this case at the
time Rodawald actually shot the revolver, the defendant
honestly believed himself to be in danger of great bodily
harm from the deceased, from the man killed, and in firing
the shot charged in the indictment the defendant acted upon
that belief, then that the defendant is excusable, whether in
fact such danger actually existed or not."    This request was
refused and the defendant duly excepted.    This ruling of
the learned trial court is now defended by the learned dis-
trict attorney in one way only, and that is, that the request
was not expressed in the precise language of the statute ;
that is to say, it omitted the language, " when there is a
reasonable ground to apprehend a design," etc., but the

request embraced the condition that the defendant honestly believed that he was in danger of great bodily harm, and that if acting upon that belief he fired the fatal shot, then he was excusable. I think that the request was substantially sufficient within the scope and meaning of the statute. If the jury could find that what the defendant did was under an honest belief that his life was imperiled, or that he was in danger of great bodily harm, then clearly the defendant could not have been convicted of murder in the first degree, even if he could be convicted of some inferior grade of homicide. There was proof in the case, as already stated, which would justify the jury in finding that to be the fact, and the refusal of the learned trial court to give the instructions as presented was error, since the refusal to so charge amounted in substance to a direction that the jury could convict of murder in the first degree even though satisfied of the truth of the facts embraced in the request. But some of my associates now think that the district attorney has not placed his justification of this ruling upon the proper ground, and that the ruling should now be upheld on the ground that it had already been given. The only reference to this subject to be found in the charge is the following : The learned trial court read to the jury all the statutes upon the subject of murder in its different degrees, and upon the subject of manslaughter, justifiable or excusable homicide. These statutes are all of considerable length, and it is too much to expect that the mere reading of the text is sufficient to inform the lay mind as to their application. The learned trial judge referred to the question now under consideration only by reading the statute, which is as follows: "Homicide is also justifiable when committed, either in the lawful defense of the slayer or of his or her husband, wife, parent, child, brother, sister, master or servant, or of any other person in his presence or company when there is reasonable ground to apprehend a design on the part of the person

slain to commit a felony or to do some great personal injury to the slayer, or to any such person, and there is imminent danger of such design being accomplished." In no other way did the learned trial judge convey to the jury the idea embraced in the request. There are only a few words in this statute which have any application to this case, and the proposition now is, that the mere reading of the statute, with a great number of other statutes on the subject of homicide, must have conveyed to the minds of the jury the same idea that is embraced in the request, that is to say, the argument is that the jury must be deemed not only to have carried in their minds this vast mass of statutory verbiage, but was able to pick out of it the idea that applied to the case. The request was framed in simple terms, well calculated to convey to the jury the precise rule of law that applied to the evidence which they were about to consider. The mere reading, in the presence of a jury, of such a statute, without any explanation as to how and in what respect the statute applies to the case, is not a sufficient discharge of the duty of the trial court engaged in the trial of a capital offense. If the request had a foundation in the evidence, as it certainly had, then it should have been given to the jury for their guidance.

In Remsen v. People (43 N. Y. 6) the defendant's counsel read to the court, in the presence of the jury, three propositions in writing which he requested the court to charge. The recorder, addressing the counsel for the defendant, replied : "I charge your third proposition ; the first and second I decline to charge," and to this refusal there was an exception. The third request was this : " Third. That good character is a fact to be considered by the jury like every other fact in the case, no matter what the other testimony in the case may be." The question in this court was whether the charge was sufficient, and Judge Allen, speaking for a unanimous court, said : "I doubt if the response

of the judge to the request of the counsel for the prisoner to charge as stated in respect to the evidence of good character by the accused, can be regarded as a part of the charge and instructions to the jury. It was a transaction between the counsel and the court, and constituted no part of the charge and instructions addressed to the jury." The full facts of that case are not reported in the volume cited, but they appear in the record of the case upon appeal just as here stated. Now, if the written request in that case, which was assented to and charged by the court, and in terms covered the whole question and was concededly correct, did not control the case as a part of the charge, how can it be said that the mere reading of a series of complicated statutes to the jury, followed by a refusal to charge a request which embodied the very pith and substance of the statute and pointed out its application to the evidence, gave to the defendant all his rights upon the trial? The request was a very reasonable one ; it applied to the case directly and to the vital question involved, and I think should not have been refused. The law applicable to this feature of the case has been well stated by a modern author of the highest authority in these words : "The law of the case which the judge is to lay down to the jury is not the abstract law, such as a statute or a common-law definition of a crime, but the law's conclusions from the several and perhaps varied facts which the evidence tends to establish, viewed in connection with the pleadings. Therefore, no abstract proposition, however correct, should be given in charge, not only because it would be confusing to the jury, who being unused to legal disquisitions, would not know how to apply it, but also because its combination with the special facts might render it erroneous. In other words, the judge should state, not the general law of the subject, but the legal rules governing the facts in controversy—all of them, not a part only—as the evidence tends to prove them, and his words should be

interpreted and judged of, not in any abstract way, but with reference to those facts. For the same language may be correct or erroneous according to the facts whereof it is spoken. Still, an abstract proposition possibly may, and sometimes does, fit the facts, in which case it is properly given. And it will not always be error to read extracts from reported decisions or the words of the statute, or of a text-book, accompanied by instructions adapting them to the particular case; yet it is not often advisable." (Bishop's New Crim. Pro. vol. I [4th ed.], § 978.) The text quoted seems to be such a reasonable and sensible statement of the law concerning the duties of the court upon the trial of a capital case and the legal rights of the defendant, that any reference to the numerous cases cited in the notes is unnecessary. It must be obvious to any one that the rule thus stated applies directly to this case. "It is not the words of the law, but the internal sense of it, that makes the law; the letter of the law is the body, the sense and reason of the law is the soul." So in this case it was not the statute or bare words of the law that should have been given to the jury, but the sense and meaning of the law, when applied to the facts in evidence. In other words, the conclusion which the law draws from the particular facts of the case.

Even if the question is more doubtful than it appears to me to be, the defendant should receive the benefit of the doubt.

I think there should be a new trial in this case.

Gray, Bartlett and Werner, JJ., concur with Vann, J.; Parker, Ch. J., and Martin, J., concur with O'Brien, J.

Judgment of conviction affirmed.