Fuchsberg, J.
(dissenting). I would yield to what the *1049 majority would characterize as the appellant’s “importuning” and roll back important aspects of this court’s now much criticized decision in People v Rodawald (177 NY 408 [1904]; see, e.g., Proposed Code of Evidence for State of New York, § 404, subd [a], par [2], commentary, at p 39, recommending repudiation of Rodawald; see, also, 1 Wharton’s Criminal Evidence [13th ed], § 236; 1 Wigmore, Evidence [3d ed], § 63, n 1 [contrary rule prevailing in Federal and majority of State jurisdictions] *).
Precedentially compelled adherence to flawed portions of Rodawald caused the trial court, sitting without a jury, to disregard the fundamental and pragmatic policy which recognizes that, in striking a balance between competing evidentiary rules, one must never lose sight of the fact that effective fact finding requires “utilizing all rational means for the ascertainment of truth” (4 The Works of Jeremy Bentham [Bowring ed, 1843]). Because a failure to be true to that principle deprived the appellant of proof which went to the heart of his guilt or innocence, there should be a new trial.
The proffered proof, in juxtaposition to the factual issues in this case, tells its own tale. The 15-year-old appellant’s primary position, essentially that he acted in self-defense, was supported by proof that the 19-year-old Kirwan not only initiated the brawl to which his life became forfeit, but that he had viciously and unceasingly carried the attack throughout. To the point, the trial record tells us that, among other things, Kirwan had been intoxicated all of the evening in question; that, while in that condition, before he took after the appellant, he had, in independent acts, assaulted the manager of a fast-food restaurant and harassed a barmaid; that, in the melee he had started, he violently threw the appellant to the ground; that, over forcible restraint which *1050 bystanders repeatedly tried to exert, he successfully fought free to resume his merciless pursuit of the appellant; and that it was he who drew the knife. However, most important to the question at hand is that this proof did not go uncontroverted. There was also conflicting testimony, for instance, to the effect that it was appellant who was first seen in possession of the knife and that Kirwan had come to a standstill at the instant he received the fatal wounds.
It was in this evidentiary context that unimpeachable documentation of decedent’s past behavior was offered for the purpose, as the majority acknowledges, of lending credence to appellant’s version of Kirwan’s conduct. The proffered proof was in the form of official records of psycho-pathological conduct and criminal acts on Kirwan’s part paralleling those to which the appellant claimed he had been subjected. These included recent repeated hospitalizations, whose charts recorded that Kirwan “drinks about half a quart of rum a day”; that within a year he had been arrested five times, “mainly for assault and robbery and once or twice for violent behavior”; that “his episodes of violence are more related to his short temper”; that Kirwan himself admitted that he “got into trouble when he drinks” and that, only some four months before his death, he had presented himself with a complaint of depression to which he attributed the fact that he had stabbed someone without reason. A still later entry certified to an objective medical diagnosis of “alcohol deterioration” and “explosive personality”. These entries, all within the year that came to an end in the encounter with the appellant, were capped by a still more recent one in the records of the New York City Division of Criminal Justice Services memorializing that Kirwan had been taken into custody for related behavior for the criminal aspects of which he admitted his guilt.
Obviously, the conduct the appellant’s defense attributed to Kirwan on the occasion out of which this prosecution arose and Kirwan’s comportment in the many episodes to which the excluded proof would have certified are about as identical as such things can ever be expected to be. It was impossible to claim that the latter was remote for it had continued virtually to the end and was both chronic *1051 and constitutional in nature. The reliability of the sources from which it was established is unquestionable. And, its competence and materiality is underlined by its pattern-like repetitiveness (People v Allweiss, 48 NY2d 40, 49 [evidence “admissible not because it showed the defendant’s propensity * * * but because it demonstrated a distinctive repetitive pattern”]; see People v Jackson, 39 NY2d 64; People v Molineux, 168 NY 264). Above all, it is notable that appellant’s rejected offer was not of Kirwan’s general character or reputation, but of specific acts which for all practical purposes mirrored those which he exhibited in his encounter with the appellant.
Concededly, appellant did not attempt to introduce the evidence to prove that he had prior knowledge of Kirwan’s uncontrollably violent and assaultive predisposition, for he did not rely on any theory of apprehension of danger justifying preventive action (cf. People v Miller, 39 NY2d 543). That was the central issue in Miller, in deciding which some five years ago this court found it necessary to reverse the trial court and the Appellate Division, each of which, expressly relying on Rodawald, had refused to permit the defendant there to introduce evidence to show that in shooting his sister he reacted to his knowledge of prior specific instances of intoxication, violence and psychotic behavior by the person whom he tried to ward off by an anticipatory attack. In so doing, as the majority acknowledges, the court, at that time and in so many words, stated that “ [w] e reverse not because the courts below failed to properly administer the law, but because we believe the law itself should be changed and that the defendant is entitled to the benefit of that change” (People v Miller, supra, at p 554). To the extent that it then went on to perpetuate the other undesirable aspects of Rodawald, it was largely uttering obiter dicta, hardly a basis for the survival of these troublesome vestiges.
To make the distinction clear, appellant’s counsel here made no mystery of his offer of proof. It was “to show that [Kirwan’s] behavior in the past was such that [it] would lend credence to testimony about his behavior on the night of [his death] ”. It was to this offer that the Trial Judge, citing to Rodawald, rejoined that he would accept and, con *1052 cordantly, consider it only “subject to [its] connection” with a showing of prior, apprehension-causing knowledge, a condition which appellant had never claimed he would be in a position to meet and which, in any event, was unrelated to the ground on which its admissibility was being urged. The result is that the proof never went in.
To uphold this ruling, the court today finds it necessary to give renewed vitality to Rodawald. In my view, the reasons behind what was left of the rules it laid down, as this case illustrates, are too unpersuasive to leave any doubt that the remains should receive a respectful legal interment.
The rule bases its exclusions on a fear that evidence of propensity will be misapplied by a jury to license criminal conduct against an unworthy victim (People v Rodawald, 177 NY 408, 422-423, supra). In the present instance, of course, this rationale would overlook the fact that, in the Family Court in which this case was tried, the evidence was weighed, as already noted, by a Judge and not a jury. More generally, the rule also proceeds from the mistaken and, indeed, entirely unempirical assumption that modern juries, over three quarters of a century after Rodawald first spoke, are “bereft of educated and intelligent persons who can be expected to apply their ordinary judgment and practical experience” (cf. Havas v Victory Paper Stock Co., 49 NY2d 381, 386). Perhaps above all, where a foundation for introducing the evidence has been laid, as here, by relevant testimony depicting the incident in question, the possibility of such misunderstanding of the purpose to which this evidence may be applied is so outweighed by truth-finding considerations that concern for it is obviated (1 Wharton’s Criminal Evidence [13th ed], § 236; 1 Wigmore, Evidence [3d ed], § 63; see State v Miranda, 176 Conn 107, 110 [probative value of evidence of decedent’s predisposition outweighing any risk it “would tempt the jury ‘to measure the guilty of the accused by the deserts of the victim’ ”]).
Specifically, where “the question is what the deceased probably did, not what the defendant probably thought the deceased was going to do”, no showing that the defendant knew of the decedent’s characteristic conduct should have been necessary (1 Wigmore, Evidence [3d ed], § 63, at *1053 p 470). As a matter of fundamental fairness, its .irresistible relevance permitted no other result. Admission of the proffered evidence would also have accorded the deference due our basic philosophic belief that, everything considered, in criminal cases there is to be greater latitude in admitting exculpatory evidence than in determining whether prejudicial potentialities in proof offered to show guilt should result in its exclusion (see, e.g., 1 Wigmore, Evidence, § 194).
Finally, I observe that it is largely upon these considerations that modern codes such as the Federal Rules of Evidence, the ALI Model Code of Evidence and our own New York State Proposed Code of Evidence, not to mention the pre-eminent text writers to whom I have already referred, urge abandonment of the rule the majority would today reassert.
For all the reasons stated, the order of the Appellate Division should be reversed, the Family Court determination should be vacated, and the appellant should receive a new trial.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur; Judge Fuchsberg dissents and votes to reverse in an opinion.
Order affirmed, without costs, in a memorandum.

 States that, through judicial decision or adoption of evidentiary statutes patterned on the Federal Rules of Evidence, have abandoned the outmoded parts of Rodawald include Arizona, Arkansas, Connecticut, Delaware, Florida, Georgia, Iowa, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Oregon, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Oklahoma, South Dakota, Texas, Virginia, Washington and Wisconsin. (But see Commonwealth v Connolly, 356 Mass 617; Commonwealth v Horne, 479 Pa 496.) Most of the remaining States have not had occasion to reach the question.