MARKS ARNHEIM, INC., Appellant, *v.* SIDNEY HILLMAN, Individually and as General President of the AMALGAMATED CLOTHING WORKERS OF AMERICA, an Unincorporated Association, and Others, Respondents.

First Department, July 25, 1921.

**Injunction — action for permanent injunction to restrain labor union and members from picketing and interfering with plaintiff's employees and business — moving and answering affidavits justify granting injunction pendente lite.**

On an application for an injunction *pendente lite* in an action for a permanent injunction to restrain the defendants, the members of a labor union, their agents and confederates from picketing the places of business of the plaintiff, from interfering with its employees in the dispatch of its business, from inducing its employees to violate their contracts of employment with the plaintiff, the moving and opposing affidavits disclose a persistent and organized campaign of unlawful acts of assault, abuse, threat and intimidation towards the employees of the plaintiff and also

towards the contractors to whom the plaintiff was sending its work, justifying the conclusion that the members of the defendant union were guilty of many acts of lawlessness and unjustifiable interferences with the plaintiff's business, and that the picketing managed by defendant union was not peacefully and legally conducted, and an injunction *pendente lite* should be granted enjoining the defendants from further picketing in front of plaintiff's place of business, and from interfering with the conduct of the free dispatch of its business or in any manner hampering, hindering or harassing the plaintiff's employees.

DOWLING, J., dissents.

APPEAL by the plaintiff, Marks Arnheim, Inc., from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 4th day of May, 1921, denying plaintiff's motion for an injunction *pendente lite* and its motion for a continuance of a temporary injunction heretofore granted.

*Maurice Deiches* of counsel [*Francis L. Driscoll* with him on the brief; *Deiches & Goldwater*, attorneys], for the appellant.

*Robert Szold* of counsel [*Louis W. McKernan* with him on the brief; *Lowenthal & Szold*, attorneys], for the respondents.

GREENBAUM, J..

The action is brought for a permanent injunction to restrain the defendants, their agents and confederates, from picketing the places of business of the plaintiff; from interfering with its employees in the dispatch of its business; from inducing its employees to violate their contracts of employment with the plaintiff, and finally for a dissolution of the defendant associations on the ground that they are illegal bodies engaged in common-law conspiracies in restraint of trade. There is also a prayer for money damages.

The plaintiff is a corporation engaged in the business of tailoring men's clothes upon special orders of individual customers. It was incorporated in 1912 having succeeded to the business of the same general nature formerly conducted by Marks Arnheim individually for thirty-four years prior to plaintiff's incorporation. Its annual business amounts to about $2,000,000 and it ordinarily employs about 400 workers. From August, 1919, to November, 1920, the plaintiff conducted a union shop, employing only members of the Amalgamated Clothing Workers of America, an unincorporated

membership association of workers in the clothing trades throughout the United States, of which one Sidney Hillman is general president, and having one of its principal offices in the city of New York. Under its constitution, its general executive board has the " power and authority to call and authorize strikes and to direct and declare boycotts." The individual members of that association are constituted members of the certain local unions authorized and created under its constitution, which " from time to time designate and select delegates to attend at the General Convention of the said Amalgamated Clothing Workers of America and that said delegates elect the members and officers of the General Executive Board."

It is admitted by the defendants that the New York joint board consists of delegates elected by a number of local unions in New York and its immediate vicinity which are affiliated with the Amalgamated Clothing Workers of America.

The moving papers show and the fact is not disputed that prior and up to May, 1919, the plaintiff conducted an open shop, employing men regardless of their union affiliations, who were paid on a piece work basis; that the Amalgamated Clothing Workers of America having secured a membership of a considerable number of the workers in plaintiff's shop, a strike was called by the union which resulted in an agreement with plaintiff pursuant to which it took back the workmen who had struck and employed only members of that association. Plaintiff asserts that it became apparent during April, 1920, that the production in its shop was falling off considerably and " that the workers were not producing sufficient to warrant payment of the wages they were receiving; " that there were fourteen workers who were found to be " inefficient and trouble makers, and who were hindering the honest workmen from giving a full day's work for a full day's pay; " that the plaintiff complained to the union of the foregoing conditions and asked that the plaintiff be permitted to discharge these workers. Among others, it complained to one Jack Isreal, who was the chairman of the shop workers, of the manner in which the work was being done and was told that he was unable to do anything to better conditions, but suggested that Mr. Arnheim, president of the plaintiff, make a

complaint to the joint board; that conferences thereafter were held with the representatives of the joint board as a result of which there was an increased production for a short time, but which thereafter again fell off so that the cost of production of a garment was so high that it could not be offered to the public at a reasonable price and in consequence of which the sales of plaintiff were very largely reduced; that the plaintiff negotiated with the board for the purpose of fixing " a standard of production for the shop with no reduction from the present scale of wages, but with the right on [plaintiff's] part to make deductions from the weekly wage;" that this proposition was refused by the union officials and as conditions grew steadily worse plaintiff concluded on November 27, 1920, to discontinue its tailoring shops entirely and to discharge every worker therein; that its president was asked by Shiplacoff, who was the manager of the joint board, what he meant by so doing and when told that plaintiff had decided definitely to run the shop as an open shop on piece work basis, Shiplacoff replied: " You will be sorry, as we will not allow you to continue business as an open shop without recognizing the union."

In the affidavit of Shiplacoff touching upon the differences just recited it is stated that his " investigation showed that the difficulty with production in the Arnheim shop was that the management was bad and that the work was not continuous," but he does not deny having made the statement just quoted. Thereafter the plaintiff sent out all its tailoring work to outside contractors and no manufacturing was done on the premises of the plaintiff, excepting that it retained a small tailoring force at the shop for alteration work and for the cutting of the garments before being sent out to be made up; and that plaintiff sought contractors running open shops to do its work in order to avoid differences with the Amalgamated Clothing Workers of America or with any of its agents, representatives or members.

About ten days after the plaintiff closed its shop a number of the former employees of the plaintiff and other members of the association began picketing in front of its three stores, situated, respectively, at Ninth street and Broadway, 30 East Forty-second street, and Fifty-first street and Broadway.

It is also alleged in the moving papers that the Amalgamated Clothing Workers of America is not an ordinary trade union, " but is a radical departure in unionism by the revolutionary element of the clothing workers, who openly preach violence to attain their purposes of securing the means and instruments of production and destroying all private and individual ownership," and that it is not recognized by the American Federation of Labor, but that it is composed " practically of all foreigners unaccustomed and unacquainted with American institutions and ideals, and that as deponent is informed and verily believes a very small proportion of said members are citizens of the United States."

In support of this charge special attention is directed to the preamble of the constitution of the defendant Amalgamated Clothing Workers of America which recites as its fundamental purpose the following: " The industrial and inter-industrial organization, built upon the solid rock of clear knowledge and class consciousness, will put the organized working class in actual control of the system of production, and the working class will then be ready to take possession of it."

The defendants deny that the plaintiff's interpretation placed upon the foregoing quotation of its constitution is justified and assert that it was merely " couched in labor union rhetoric " merely to convey the idea that it is " in favor of modern industrial trade unionism as a necessary development of the trade union movement." Defendants also assert that they are loyal to the principles of the American government, and that they were organized for the purpose of effecting a nation-wide plan of co-operation and collective bargaining with the employers of clothing labor for the purpose of establishing proper standards and relations between employers and employees and " bringing about law and order into the industry and in substituting reason for brute force " and that the system and policy pursued by it have been satisfactory to many of the largest clothing manufacturers in the United States.

In corroboration of the claim of defendants that the purposes and methods adopted and pursued by them were designed for the benefit of both employer and employee, they submit many reports and affidavits of professors and others promi-

nent in the domain of economics and sociology, approving of its activities. It is clear, however, that such opinion evidence is not only incompetent, but it has nothing to do with the plaintiff's charge of disloyalty. Besides, in passing, it should be observed that the criticised preamble was evidently interpreted by one of their leading members in a speech delivered by him to justify plaintiff's criticisms against the defendant unions. It is true that upon this motion they disclaim approval of the sentiments of their associates, but it does not appear that they have ever taken official action disavowing the disloyal sentiments of their spokesman.

It is, however, apparent that the court is not in a position upon the record before it to determine whether the defendant Amalgamated Clothing Workers of America is a mischievous, disloyal and un-American organization. The proper forum for threshing out the matter of its character and aims would be upon the trial of the action. We shall, therefore, on this appeal disregard the serious accusation against the Amalgamated Clothing Workers of America and assume that it is a loyal American association and consider the question before us upon other features of the case. Nor do we consider it necessary upon this appeal to pass upon the merits of the controversy between the parties to this action, since of necessity such a question cannot be satisfactorily determined upon the conflicting affidavits before us. We are thus brought to the consideration of the alleged overt acts of lawlessness on the part of the defendants after November 27, 1920. In the exercise of that freedom of action which the defendants themselves assert on their own behalf, plaintiff and its employees are entitled to protection against lawless acts, which are calculated to interfere with, hinder or harass them in the pursuit of their chosen lawful vocations.

Upwards of forty affidavits were submitted by plaintiff which read in connection with the opposing affidavits disclose a persistent and organized campaign of unlawful acts of assault, abuse, threats and intimidation towards the employees of the plaintiff and also towards the contractors to whom plaintiff was sending the work. The moving affidavits set forth with sufficient detail the matters to which they refer and in a large number of cases the names of those who are

charged with lawlessness and misconduct are given. There were six convictions for assault. It is true that those thus accused deny the commission of the specific acts with which they are charged and give versions of the alleged occurrences which if correct would indicate that the strikers were very gentle and considerate towards the plaintiff's employees. This is highly improbable. The timidity which naturally might be expected on the part of employees of a firm against whom a strike is pending to make any affidavits hostile to defendants is an added circumstance for crediting the testimony of these witnesses as to specific lawless acts of which they assert they were the victims. On the other hand, it is a matter of common knowledge that one charged with the commission of a crime is not prone to admit his guilt.

The answering affidavits indicate clearly that troublous incidents occurred in which the plaintiff's employees and members of the defendants' union were involved. The defendants admit the methods pursued by them in visiting the various shops of plaintiff's contractors for the purpose of ascertaining whether they were engaged in doing work for the plaintiff. The affidavits of one John Foerster, one of these contractors, and of his sons uncontradictedly show that strange men came to his workshop in Brooklyn on the pretense of looking for work, looked over the garments that were being then tailored and discovered that the shop was engaged in making garments for the plaintiff; that later in the day about twenty-five men came to affiant's shop and tried to force an entrance which they were unable to accomplish owing to the fact that the daughter of Mr. Foerster prevented them from getting into the building; that two weeks later about ten or twelve strange men came to the shop and when asked what they wanted they refused to state their mission and were thereupon ordered to leave the premises. It is also averred that on March twenty-fifth a number of men came to Foerster's house for the purpose of entering it and having been refused admittance they went to the rear of an adjoining house, breaking a lock to gain entrance, climbed over the fence and attacked Foerster's sons with knives and threw water over Foerster himself; that one of his sons received a stab wound in the arm and a cut over one of his eyes and another son

was stabbed in the arm; that one of these assailants was captured and arrested by the police and was held for trial. Another contractor, De Sanctis by name, testified that in January, 1921, a number of men called at his place on several occasions, asserting that they were connected with the Amalgamated Clothing Workers of America, and stated that they desired him to show them for whom the work in his shop was being done.   He refused to comply with their demands, stating that he was conducting an open shop and it was nobody's business for whom the shop was working.   Subsequently, about fifteen men came to his factory and demanded to see the work tickets, and according to the affidavit of De Sanctis, " they circulated in deponent's shop assuming a threatening attitude towards the employees of deponent's firm, and told these employees that they must immediately stop work and go with them to the Joint Board of the Amalgamated Clothing Workers of America, and sign up with the union."   De Sanctis avers that thereafter he consented to go with the men who called upon him to the joint board at a meeting place on East Fourth street; that he went there and was told by one who acted as chairman of the board that deponent's firm must stop work, and further " that the workers of deponent's firm would be signed up as members of the Amalgamated Clothing Workers of America and that deponent's firm would be told for whom work could be done and that they could work only for houses that had settled with the Amalgamated Clothing Workers of America with the consent of the Joint Board." Deponent avers that he absolutely refused to have. any dealings whatever with the defendant association and stated that he would continue to run his shop as he saw fit; that he was an American citizen and that he had a right to freedom of action to conduct his own business free from any dictation and that he could work for whom he wanted.   He also avers that " on February 8, 1921, just after deponent had left the place of business of Marks Arnheim, Inc., at Broadway and 9th street, and at about 10th street and 4th Avenue, deponent was assaulted by some men whom deponent had seen in front of the establishment of said Marks Arnheim, Inc.   Deponent was struck on the neck and was knocked down  *  *  *  and stunned, but on rising could not find the men who had

assaulted him, and started to walk towards University Place and 10th Street, * * * followed by an ever-increasing crowd in which deponent recognized a number of men whom he had seen picketing about the store of Marks Arnheim, Inc., at 9th Street and Broadway. Threats of personal violence were uttered from persons in the crowd and increased until deponent took his revolver from his pocket and shouted that he would shoot the first man who attacked him. In the meantime a policeman arrived and deponent was taken in custody for carrying a revolver and taken to court. There deponent proved that he had a permit granted by the Police Department for deponent's personal protection because of threats of personal violence against the deponent and because deponent handles the payrolls of deponent's firm. Deponent was thereupon properly discharged."

Referring to the occasion when De Sanctis was assaulted, the defendants interposed an affidavit on the part of one Sherman and corroborated by one De Mattia, alleging: " We met him [meaning De Sanctis] shortly after he came out of Marks Arnheim's shop. He had left there and we were just leaving the pickets, having been relieved by other persons. I addressed him and said: ' Will you please be kind enough to tell me whether you are working in Arnheim's store? ' I did not say this in a threatening manner, but merely asked him that question. Without waiting for any further remark, this man De Sanctis pulled a revolver from his pocket. Ralph De Mattia and myself naturally drew back. One of Wanamaker's drivers, who had seen this, handed me a whistle to call a policeman. I blew the whistle but there was no policeman there and a chauffeur then offered to take us to Second Avenue in his automobile for a policeman. We found a policeman and told him what had happened. He came back to the corner of Second Avenue and 11th street with us and there we saw this man still holding his revolver in his hand, talking to and threatening a man who was an utter stranger to us."

Direct proof of a conspiracy is rarely available. Conspiracies are ordinarily hatched in secret. The incriminating circumstances surrounding the acts of conspirators, the cumulative testimony of many witnesses, who have no apparent reasons for inventing occurrences or falsely testifying and the

strong probabilities that the incidents narrated took place justify the conclusion that the members of defendants' union were guilty of many acts of lawlessness and unjustifiable interferences with the plaintiff's business and that the picketing was not peacefully nor legally conducted.

The order denying the motion for an injunction *pendente lite* should be reversed, with ten dollars costs and disbursements, and the defendants enjoined from further picketing in front of the plaintiff's place of business and from interfering with the conduct of the free dispatch of the plaintiff's business or in any manner hampering, hindering or harassing plaintiff's employees.

CLARKE, P. J., and SMITH, J., concur; PAGE, J., concurs in result; DOWLING, J., dissents.

Order reversed, with ten dollars costs and disbursements, and motion for injunction granted as stated in opinion.