BERG AUTO TRUNK & SPECIALTY CO., INC.; Plaintiff, *v.* MAX WIENER, ISADORE GRILL, as Secretary of the SUITCASE, BAG AND PORTFOLIO MAKERS' UNION, an Unincorporated Association, and Others, Defendants.

Supreme Court, Queens County, July, 1923.

*Injunctions — motion for injunction pendente lite — unlawful picketing — plaintiff's refusal to arbitrate — defendants restrained from stationing more than one picket at a time at each entrance to the building where plaintiff's place of business is located and from the use of threats.*

MOTION for injunction *pendente lite.*

*Paul M. Abrahams* (*Townsend Scudder*, of counsel), for plaintiff.

*Goldstein & Goldstein* (*Samuel Seabury, Elias Lieberman* with him on the brief, of counsel), for defendants.

BENEDICT, J. This is a motion for an injunction *pendente lite* in an action by an employer against an unincorporated association, known as the Suitcase, Bag and Portfolio Makers' Union, and other individual defendants.

The complaint alleges, *inter alia*, an unlawful conspiracy on the part of the officials of the union to compel the plaintiff to unionize

his shop by employing none but members of the union, and further to compel his employees, of whom the individual defendants, except Wiener and Grill, were part, to breach an existing agreement as to wages and hours of labor which the plaintiff had made with his employees in October, 1922, and which, if not interfered with, would have continued in full force and effect until December 31, 1923, and on the strength of which agreement plaintiff had accepted a large order for the production of goods to be manufactured and had removed his place of business to larger and more advantageous and sanitary quarters in Long Island City.

The moving affidavits support these charges and also allege acts of violence and intimidation and unlawful picketing said to have been committed and done by the defendants in aid of such conspiracy.

As defendants in their answering affidavits denied practically every charge of overt acts of an unlawful nature contained in the complaint and motion papers of the plaintiff, I deemed it desirable, in order to ascertain the truth on oral evidence, to send it to a referee to ascertain the facts and report with his opinion thereon to me, meanwhile reserving the final decision of the motion until the coming in of the report. The learned counsel and attorneys for the parties were fully and patiently heard by the referee, who has submitted with his report and opinion over five hundred pages of testimony given by the parties and their witnesses, and I have again heard counsel on the matters set forth in the report.

It is needless for me to say that the painstaking and thorough work of the learned referee is most satisfactory, as indeed his work always is, and it leaves little for the court to say on this motion for a temporary injunction, and I shall, therefore, confine my remarks within a brief compass, leaving it to the court which shall try the case on the merits to decide it, without any bias from my own views.

There were several questions of fact litigated before the referee, and his findings on these several questions of fact I summarize as follows:

1. That there were no contracts between the plaintiff and its employees that the latter should continue to work for another year on the then existing terms as to compensation and hours and conditions of employment; that there were informal conversations between the plaintiff's president and the heads of the several departments in the shop in which some assurances were given plaintiff that the existing labor conditions should continue during the performance of certain contracts which plaintiff contemplated undertaking, but that these heads of departments did not represent those working under them so as to bind the workers by any such agreement.

2. That there has been picketing by four and sometimes six pickets at plaintiff's shop.

3. That there have been no acts of violence in connection with the strike, except one, which I do not regard as requiring injunctive relief.

4. That certain affidavits presented by the plaintiff and afterward repudiated by the affiants were not obtained in an improper manner and without knowledge on the part of the affiants of their contents.

The only question which it seems to be necessary for me to decide on this motion is whether there has been unlawful picketing. The picketing has been peaceable, but has been accompanied in some instances by threats or statements which implied threats of personal violence, and there have been present as pickets four or six men which in itself necessarily involves a certain amount of intimidation.

The Supreme Court of the United States in the case of *Am. Steel Foundries* v. *Tri-City C. T. Council,* 257 U. S. 184; 66 L. Ed. 103, has recently restated with great care in an opinion by Mr. Chief Justice Taft the rights of picketers, employees or would-be employees and employers, from which I quote as follows: " How far may men go in persuasion and communication, and still not violate the right of those whom they would influence? In going to and from work, men have a right to as free a passage without obstruction as the streets afford, consistent with the rights of others to enjoy the same privilege. We are a social people, and the accosting by one of another in an inoffensive way, and an offer by one to communicate and discuss information with a view to influencing the other's action, are not regarded as aggression or a violation of that other's rights. If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging, become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free, and his employer has a right to have him free. The nearer this importunate intercepting of employees or would-be employees is to the place of business, the greater the obstruction and interference with the business, and especially with the property right of access of the employer. Attempted discussion and argument of this kind in such proximity is certain to attract attention and congregation of the curious, or, it may be, interested bystanders, and thus to increase the obstruction as well as the aspect of intimidation which the situation quickly assumes. In the present case the three or four groups of picketers were made up of from four to twelve in a group. They constituted the picket line. Each union interested, electricians, cranemen, machinists, and blacksmiths, had several representatives on the

picket line, and assaults and violence ensued. They began early and continued from time to time during the three weeks of the strike after the picketing began. All information tendered, all arguments advanced, and all persuasion used under such circumstances were intimidation. They could not be otherwise. It is idle to talk of peaceful communication in such a place and under such conditions. The numbers of the pickets in the groups constituted intimidation. The name ' picket ' indicated a militant purpose, inconsistent with peaceable persuasion. The crowds they drew made the passage of the employees to and from the place of work one of running the gauntlet. Persuasion or communication attempted in such a presence and under such conditions was anything but peaceable and lawful. When one or more assaults or disturbances ensued they characterized the whole campaign which became effective because of its intimidating character, in spite of the admonitions given by the leaders to their followers as to lawful methods to be pursued, however sincere. Our conclusion is that picketing thus instituted is unlawful and cannot be peaceable, and may be properly enjoined by the specific term because its meaning is clearly understood in the sphere of the controversy by those who are parties to it. We are supported in that view by many well reasoned authorities, although there has been contrariety of view (citing cases). * * * Each case must turn on its own circumstances. It is a case for the flexible remedial power of a court of equity, which may try one mode of restraint, and, if it fails or proves to be too drastic, may change it. We think that the strikers and their sympathizers engaged in the economic struggle should be limited to one representative for each point of ingress and egress in the plant or place of business, and that all others be enjoined from congregating or loitering at the plant or in the neighboring streets by which access is had to the plant; that such representatives should have the right of observation, communication and persuasion, but with special admonition that their communication, arguments and appeals shall not be abusive, libelous or threatening, and that they shall not approach individuals together but singly, and shall not, in their single efforts at communication or persuasion, obstruct an unwilling listener by importunate following or dogging his steps. This is not laid down as a rigid rule, but only as one which should apply in this case under the circumstances disclosed by the evidence, and which may be varied in other cases. It becomes a question for the judgment of the chancellor who has heard the witnesses, familiarized himself with the *locus in quo* and observed the tendencies to disturbance and conflict. The purpose should be to prevent the inevitable intimidation of the presence of groups of pickets, but to allow missionaries."

It seems to me that the rules here laid down are applicable to the present case. I shall, therefore, continue the injunction *pendente lite* so as to restrain the defendants from picketing, except by one picket at a time, at each entrance to the building where plaintiff's place of business is located, by which employees enter or leave plaintiff's place of business. The injunction may also include a provision against the use of any threats or implied threat.

In all other respects the motion is denied, without prejudice, however, to a new motion to restrain all picketing, if and when the strike shall have terminated by the filling of the strikers' positions by other employees or by the strikers themselves accepting employment elsewhere. See *Wicke Ribbon Co.* v. *Korn*, N. Y. L. J. Nov. 30, 1920, Benedict, J. Before concluding, I wish to advert to the argument earnestly pressed on behalf of the defendants that I should deny all injunctive relief, because the plaintiff refused to arbitrate the differences between it and its striking employees. It is suggested that " the writ of injunction rests in the sound discretion of the court, and we earnestly urge that where one side of the controversy manifests a willingness to arbitrate and the other plants itself firmly upon the position ' that there is nothing to arbitrate,' that fact, in the absence of violence or injury to property, should of itself incline the court to withhold the writ of injunction. With deference, we submit that the time is opportune and ripe for the court to announce that the assumption of such an attitude on the part of the employer is at least a *circumstance* which operates to incline a court of equity to withhold injunctive relief. An arbitrary refusal to arbitrate under such circumstances is *an admission* that the employer recognizes that an impartial arbitration would result adversely to him, and is, therefore, an eloquent piece of evidence against the employer. It is a circumstance to which, it is most respectfully suggested, the court in such a case as this should attribute great weight. In so doing it would be using its power — the public power — as an effective means of furthering justice. A court of chancery can perform no higher or worthier service. If such a practice became general our courts of equity would become an effective instrumentality in the promotion of arbitration in industrial disputes. Litigants would soon learn that if they would secure discretionary orders from equity they must show a willingness to do equity, at least to the extent of satisfying the court that they were willing to submit their claims to an impartial investigation by those who are in a position to reach a fair and just conclusion. No more valuable contribution could be made by our courts of equity at the present time to that rapidly developing branch of our sociological jurisprudence than to indicate that the presence of such circumstances are of themselves a factor worthy of con-

sideration in the determination of the larger question whether an injunction in a labor dispute should issue."

It might be a very good thing if both parties in all industrial controversies should be compelled by law to arbitrate their differences instead of resorting to strikes and lockouts; but such is not the law at the present time, and to make the refusal to arbitrate on the part of the employer the basis of a refusal on the part of a court of equity to restrain unlawful acts on the part of the strikers would amount to giving the latter a license for any kind of violence, and thus would virtually force the employer to accept arbitration or suffer the alternative of having his business ruined. If compulsory arbitration is to be made law, it must be by action of the legislature, or possibly by the people through a constitutional amendment. Without such mandate, the courts have no authority so to act that arbitration is made compulsory. The conditions for granting injunctive relief are wrongful acts being committed or threatened, and irreparable injury resulting therefrom. The courts cannot of themselves impose added conditions.

Furthermore, the proposed rule would not operate equally upon both parties. The compulsion would be greater on the employer than on the employees, because it is ordinarily a much greater task for the employer to repair the damages resulting from a strike than for the employees. The employees can usually secure other employment, if they wish to do so, and so suffer little loss of a permanent nature. The employer, on the other hand, must oftentimes come out of a period of inactivity with his trade gone and his good will ruined. He must then spend a large amount of time and money building up his business again.

The labor unions have always objected strenuously to compulsory arbitration, whenever that method for the settlement of labor controversies has been suggested, and they have no right to try to fasten compulsory arbitration on the employers.

I may add that I myself tried in this case to bring about an amicable settlement of the differences between the parties, but without avail.

Annexed hereto is the report of the learned referee as to the facts.

Settle order on notice.

Ordered accordingly.

---

### REFEREE'S OPINION.

I. MAURICE WORMSER, Referee. The plaintiff, the Berg Auto Trunk and Specialty Co., Inc., is engaged in the manufacture and sale of trunks and luggage for use in connection with automobiles.

The enterprise was begun originally about a score of years ago by Joseph Berg, now its president and general manager. It was originally a very small business, run in a very small way on the crowded east side of the borough of Manhattan, New York city. Berg worked hard and earnestly, and with the assistance of his wife and family the enterprise gradually grew in importance, size and magnitude, so that in course of time it came to occupy several lofts in a large building on Lafayette street, borough of Manhattan, New York city. During all these years, till the year 1919, the business was run as an open shop. During that year plaintiff seems to have had an agreement with the Trunk Makers' Union, which, it is claimed, later became a part of the Suitcase, Bag and Portfolio Makers' Union, a defendant herein, by the terms of which, *inter alia*, Berg was to employ members of the union on a basis of forty-eight hours of weekly work. A strike transpired, and Mr. Berg employed attorneys, who secured an injunction against the union on the ground of breach of written agreement. Thereafter it appears that a settlement was effected and the number of hours for weekly work was set at forty-eight. Some months thereafter a corporation was organized under the name of the Lafayette Luggage Corporation, controlled by the plaintiff herein, and it is claimed that this artificial entity did not keep faith with the union. The proof shows that the number of hours of weekly labor was advanced from forty-eight to fifty without any increase in pay to the majority of the laborers. However, no strike seems to have been called and there does not appear to have been any serious manifestation of dissatisfaction on the part of the employees. During this period plaintiff employed about 110 workers, the number of hours per week was fifty, the wages paid were pursuant to an arrangement made by Mr. Berg with the individual employee. Overtime was paid for at the regular rate. The employees do not appear to have been paid for their services on holidays, except in the case of such Hebrew holidays as New Year's Day and the Day of Atonement. On most secular holidays, with the exception of New Year's Day and Christmas, the factory was open for work.

The plaintiff during 1922, through Mr. Berg, began to reach out and bid for volume production on a considerable scale. New and better factory conditions were necessary. Mr. Berg determined to lease quarters in the new and magnificent building of the American Chicle Company in Long Island City, Queens county, N. Y. A photograph of this building and details in connection with the factory are found in a booklet which I have marked in evidence upon my own volition. Before leasing these premises Mr. Berg adopted the precaution of taking the heads of his various departments to the new place of business. They all expressed satisfaction. To my

mind the factory conditions are almost ideal; by that I mean, of course, the physical conditions, and not at all the question of hours, of overtime payments or of wages. It is one of the finest and most up-to-date daylight factory buildings in the country.

The move to the new factory in Long Island City took place during September, 1922, and it has been there during the eight months intervening between that date and the present. During the period between September, 1922, and February, 1923, the proof convinces me that on the whole the employees were satisfied and contented. At least they never expressed, certainly not upon any considerable scale or to any appreciable extent, any audible or overt dissatisfaction with their hours of employment, their rate of wages or the factory conditions. While there is no proof to show, as claimed by plaintiff, "that the employees were a happy and contented lot," there is nothing, on the other hand, to show that they were unhappy and discontented. It does appear, it is true, that some of them felt they should have received higher wages for the work they were doing, and should have been afforded a shorter working day, eight hours instead of nine, and four hours on Saturday instead of five, which would conform to the prevalent customs.

From the time of the strike, above referred to, until March, 1923, the plaintiff's shop was operated as what is known as "an open shop." In other words, Berg employed whom he willed, without regard to union or non-union affiliations.

On March seventeenth, which was a Saturday, about seventy workers of plaintiff, we are told, had a meeting under the auspices of the defendant union. This meeting was called, it is said, pursuant to a request of the workers that the business be organized as a union shop. While plaintiff insists that the employees were "corralled." by union delegates and taken to a hall adjacent to the Queens Borough bridge and then and there made members of the union, I am satisfied that there was genuine sentiment in the shop in favor of affiliation of the workers with the union, and that this sentiment had permeated a considerable number of the workers, and in no case is there any proof whatever, as claimed by plaintiff, that they were "corralled."

Two days subsequently, on March nineteenth, a letter was addressed by the defendant union to the plaintiff. This letter sets forth certain demands in the name of plaintiff's employees, which, briefly stated, are as follows:

(a) That forty-four hours shall constitute a week's work. (In other words, that the workers should labor only eight hours per day and four hours Saturday, in place of nine hours per day and five hours Saturday.)

(b) Twenty per cent increase in wages for piece workers and fifteen per cent increase for week workers.

(c) Time and one-half addition to be paid for overtime work. (This in place of the former regular payment for overtime.)

(d) Recognition of the defendant union.

An answer to this letter was requested by March 24, 1923. Plaintiff concededly did not reply to this letter. On March nineteenth plaintiff discharged one Joseph Goldsmith, an employee, who later became active in the strike. On March twenty-first, at the noon hour, a committee called to see Mr. Berg at his office, but he did not consult with them. On the same day, at two P. M., the workers, about 110 in all in number, went out on strike. It will be observed that this was before March twenty-fourth, by which date an answer to the union's letter was requested. The employees walked out peacefully enough; there were no blows; there was no destruction of machinery; there were no threats or cursing. Nothing could have been more orderly or peaceful.

The plaintiff expressed itself to the referee as willing to have the question of wages and hours determined by arbitration, but insisted upon the right to run its own business in its own way, without the interference of the defendant labor union or any of its walking delegates, and the main bone of contention herein apparently lies in the refusal on the part of plaintiff to deal with and recognize the union. Mr. Berg was willing to deal with the men individually and directly, but not through the union. On the other hand, the defendant labor union insists and contends that the shop was unionized at the request of a considerable number of the employees, and that it was not injecting itself *sua sponte* into the situation, but was following the wishes of its members who were employees of the establishment.

On or about April 12, 1923, plaintiff secured, *ex parte*, a preliminary injunction from Mr. Justice Hagarty restraining the employees and the union and its delegates, among other things, from alleged acts of violence, picketing, etc.

To quote from plaintiff's memorandum (p. 5) it is asking injunctive relief: "*First.* Because it claims that its employees, those specifically named as the heads of departments, contracted to continue working for the following year on the same terms and conditions as were then in existence, and the plaintiff agreed to give such employees steady employment for the year. Based thereon the plaintiff accepted a large volume of contracts, the contract price being based on the assumption of existing wages and hours continuing for the year, and by the said employees breaching their contract the plaintiff will suffer irreparable injury. *Second.* Because the employees are resorting to acts of com-

mission which tend to interfere with the property rights of the plaintiff."

On the other hand, the defendant union and the other defendants claim that there were no contracts between plaintiff and its employees; that there was no attempt on the part of defendants to induce breaches of contracts; that the strike in general was conducted in a peaceful and quiet manner, and that there was no threatening or intimidation of present employees of the plaintiff; that the strike was called at the request of the workers of the shop for the purpose of improving their wages and lowering their working hours; incidentally, in order to secure recognition of the defendant union, and that the only purpose and motive of the strike, it is claimed, was to ameliorate and better the working conditions of the employees.

So much by way of preliminary statement. All that I have said thus far constitutes the background and the setting for the picture which I shall now endeavor to draw, predicated upon the facts adduced in evidence. All of the testimony offered may be divided into four subdivisions:

1. As to the alleged contracts.
2. As to the picketing.
3. As to the alleged acts of violence.
4. As to the preparation and contents of the affidavits submitted upon the motion.

I shall discuss each of these in turn.

### 1. As to the Alleged Contracts.

As to the existence of the alleged contracts between plaintiff and its workers plaintiff concedes, in its memorandum, that the witnesses are not in accord. The officers of the plaintiff maintain that conversations took place, resulting in certain agreements, and the witnesses for defendants deny this *in toto*. All of the witnesses are interested parties.

In his moving affidavit Mr. Berg claims that he " called the employees together;" and that they told him " collectively and many individually " that there would be no changes as to wages and hours. He claims that the occasion for these conversations was because he desired to bid upon certain contracts, and held these conversations in order to intelligently estimate the amount of his bids. He, corroborated by Shapiro, Goldman and Miss Herschmann, testified that before accepting the contracts which were being bid upon plaintiff obtained the definite assurance of a continuation of existing labor conditions, and it is asked, on plaintiff's behalf, whether this is not probable, since not to do this would display a lack of business acumen. It is further pointed

out that there was a personal and friendly relationship existing between Mr. Berg and most of his workers, who, with a few exceptions, were in his employ and under his management ever since they landed in this country.

Upon questioning by me, Mr. Berg admitted that he did not call his employees together and that his statement in that regard, in his moving affidavit, is inaccurate. He named six individuals with whom he stated he had conversations as to hours and wages. It is significant to note that all of these were heads of departments and that they were not ordinary laborers but were acting for plaintiff in a supervisory or foreman's capacity. Upon my questioning, Mr. Berg stated that these gentlemen had no authority from the workers to speak for them or to make contracts for them. I am satisfied that certain conversations took place between Mr. Berg and the various heads of departments, in which they assured Berg that *they* would continue to work for him during 1923 at the same rate of wages and the same number of hours per week as previously, but there was nothing very definite or certain about these conversations; they were very general in terms, and whether, in any case, they amount to contracts, is a question of law not within my province, but to be passed upon by the learned court. In any case, these foremen or heads of departments were not authorized to represent any one but themselves. I so specifically find. Mr. Berg, a frank witness, himself virtually corroborated this. So that there cannot be any question that the alleged agreements, assuming for argument that they amount to contracts, could not bind any of the workers, with the possible exception of the six foremen or supervisors who are claimed to have entered into them, and of these six, two (Goldman and Lang) did not join the strike, but have continued their employment with plaintiff without any interruption. It should be noted that the minute books of the plaintiff corporation do not contain any entries in reference to said alleged agreements with the heads or foremen of the departments, and it seems to me that, while some general conversations undoubtedly took place, these lacked the surroundings, formalities or solemnities pursuant to which contracts are ordinarily made. Plaintiff did not prove, in fact, made no attempt to prove, that notice was given to defendant union of these alleged verbal contracts.

As I have said, I am inclined to believe that Mr. Berg did have some talks from time to time with the foremen or heads of departments about the future business of the firm, scale of wages, etc., but I doubt whether these conversations reached the dignity of contracts within the contemplation of law, or that there was anything legally binding about them. In any case, the men to

whom he talked did not represent other employees in general so as to bind them.

The defendants claim "that the story about contracts must have been concocted by Mr. Berg after the strike had been declared in an effort to invoke the jurisdiction of the court." I refuse to so find. I believe, as I have said, that certain conversations with the foremen or heads of departments took place, but agree with defendants that these foremen or heads of departments did not represent the employees in general; that there was no collective agreement made, and, while it may be outside of my province, I venture to doubt whether these conversations attained the dignity or formality of binding contracts so as to be entitled to the beneficent protection of equitable interposition. The court will understand that I in nowise pass upon this latter question, which is one of law, yet I venture to express an opinion, applying by analogy the remark of Judge Vann, that "no court is wise enough to decide who told the truth without seeing the witnesses." *People* v. *Rodawald,* 177 N. Y. 408, 419. See, also, *Lehr* v. *Lehr*, N. Y. L. J. May 9, 1923.

## 2. As to the Picketing.

The important question of the right to picket, of course, is one of law and is outside of my province upon this reference, but it is well to review in detail the method of picketing adopted by the defendant union and the other defendants in this case. It seems to me that once the facts are ascertained and stated with precision the application of the appropriate rules of law will be greatly facilitated. As to the law I venture to call attention to the opinion of Mr. Presiding Justice Clarke of the first judicial department in *Altman* v. *Schlesinger,* 204 App. Div. 513; 198 N. Y. Supp. 128, and to the opinion of Mr. Justice Smith in *Yablonowitz* v. *Korn,* N. Y. L. J. May 24, 1923; also to the opinion of Mr. Chief Justice Taft in *American Steel Foundries* v. *Tri-City C. T. Council,* *supra.*

Mr. Berg, plaintiff's president, testified that when the men went out on strike they went out peacefully and quietly, as I have already said. One machine was subsequently found out of order, but there is no proof connecting that with the strikers. No harm came to any of the employees who did not join the strike, either in the presence of Mr. Berg or otherwise. Berg stated that there was no disorderly conduct as far as he could see, but in that connection it should be noted that there was at least one policeman always in attendance.

The greatest number of pickets ever seen around the premises by Harry Davis, a witness for plaintiff, whose testimony I believe in its entirety, and who impressed me extremely well, was *six.*

During most of the time there were four pickets. No violence accompanied the picketing. Mr. Berg testified that it was orderly enough. The pickets walked up and down, two abreast, outside of the factory, carrying signs which stated that the pickets were employees of plaintiff on strike. These pickets would stop persons, including present workers, having a right of egress from and ingress to the plaintiff's premises, and tell them that they were on strike and solicit them to aid the strikers.

The substantial conceded facts are, therefore, that defendants maintained usually four, and at times six, pickets about plaintiff's premises, each wearing a sign mentioning that the employees of the plaintiff company were on strike; that these pickets walked up and down, two abreast, stopping some individuals going into plaintiff's premises to seek employment or otherwise, but using no actual violence, striking no blows, and uttering no curses; that one or more policemen were around the premises continuously during the day.

Defendants contend that they have the right thus to picket plaintiff's establishment. This, in my opinion, raises a pure question of law, and not of fact, and is, therefore, outside my province upon this reference. I express no opinion upon this matter except that, with great respect, I venture to state, for the convenience of the court, the respective contentions as tersely as possible, as follows:

Defendants contend that they have an absolute right peacefully to picket; that the cases do not prohibit picketing, provided it is carried on without actual force and violence.

Plaintiff, on the other hand, claims that it is kept in constant anxiety by the presence of these pickets; that its business is run under conditions of continual fear and worry attending each and every move made; that the employees who continue to work are kept in a state of nervousness and excitement, and that all of this, taken in concert and combination, tends to break down the moral stamina and *esprit de corps* of plaintiff and its present employees, thereby tending to the disruption of plaintiff's lawful business. In other words, that though no actual violence is used, the effect is equivalent to a use of force *vi et armis*. To which the defendants replied: " How can we carry on a strike at all, having a lawful right to strike, unless we are allowed to picket peacefully? "

As I have said, this raises a pure question of law, and if I possess convictions, as it may be assumed I do, upon this subject, this is not the place or occasion for their expression, as both counsel caution me in their brief that the order of reference confines me to passing upon the facts, that questions of law are reserved for the learned court.

### 3. As to the Alleged Acts of Violence.

On this subject let me state, tersely, at the outset, that I find as matter of fact that the strike on the whole was conducted peacefully and quietly. I do not wish to be understood as stating that it was as peaceful and quiet as "the religious solemnity" of a Van der Luyden dinner party of 1875, so well described by Edith Wharton in her "Age of Innocence," pp. 59–61. Nevertheless, this strike, so far as I can glean from the evidence adduced before me, has been conducted in an infinitely more peaceful manner than the "Jazz parties" (A. D. 1922), so graphically depicted by Gertrude Atherton in "Black Oxen." In order to successfully survive these latter, if the learned authoress' portrayal is correct, a far more robust physique than the physique of most of these strikers would seem requisite.

Or, to leave romance aside, though I feel that the illustrations are not at all out of point, and taking all of the evidence of allegations of threats, intimidation, violence, etc., alleged by plaintiff duly into account, it is very apparent to me that plaintiff has failed satisfactorily to prove that there was any substantial violence or intimidation committed by the defendants, and that, on the contrary, the strike as a whole was conducted reasonably peacefully. This is further demonstrated by the circumstance that only one arrest appears to have been made, and the offense of the striker, if any, was not in anywise grievous.

Before considering the alleged instances of violence in detail I wish to point out that although plaintiff in Mr. Berg's moving affidavit sets forth that there was violence, threats, assaults and intimidation, Mr. Berg upon my questioning stated that these statements were merely hearsay, that he had no personal knowledge thereof, and that he individually had not seen any violence, threats, assaults or intimidations committed by defendants, with the exception of one matter, to which hereinafter I shall refer.

Only five instances of alleged violence and threats really necessitate my consideration in any detail:

(1) *As to Berg.* Mr. Berg, whose frankness as a witness deeply impressed me, testified that while he was looking out of the window of his office one day in the course of the strike, on or about March 23, 1923, one of the striking pickets, named Morris Frankel, spit up at him and the saliva soiled his clothes. The picket, Frankel, denied this entirely. It is argued on defendants' behalf, as indicating the improbability that this occurrence took place, that the window was at least eight to nine feet above the sidewalk; that a policeman was around the building, and that Frankel is a married man, the father of two children. One or the other of these witnesses I must disbelieve, and after careful reflection

I disbelieve Frankel. It is a matter of common knowledge that one charged with the commission of a, misdemeanor "is not prone to admit his guilt." *Arnheim, Inc.*, v. *Hillman*, 198 App. Div. 88, opinion per Mr. Justice Greenbaum; *Altman* v. *Schlesinger, supra,* opinion per Mr. Presiding Justice Clarke.

The readiness and frankness of Mr. Berg in answering all my questions, even though adverse to his contention, have led me to believe him, though I confess that after having seen and heard Frankel I was at first grievously in doubt, but a careful reading of his testimony in answer to my questions shows his extremely strong union sentiments, and it is not at all improbable that his zealousness may have led him into an act of indiscretion.

(2) *As to Davis.* This witness, as I have already said, made a particularly good impression upon me. He impresses me as frank and truthful, and I believe his testimony. He said that when he was taking some of the new employees to the railroad station in an automobile one of the strikers on picket duty said to him: " Listen, Harry, I am a good friend of yours. * * * I do not want you to get into any trouble *and I do not want you to get into our way.* Last night you took some men home in the car, and that is hindering us. * * * If you take any more men to the station you will get in trouble, and I am a friend of yours, and keep out of trouble, and do not take anybody home in Goldman's car." This striker was later identified as one Goldsmith. Davis was not assaulted, struck, cursed at or spit upon. I find, however, that he was warned by Goldsmith not to continue to take home workers in the automobile or he would get into trouble. Plaintiff contends that this tended to create in the minds of Davis and other workers doubts and fears which would destroy their efficiency for plaintiff's needs, but plaintiff overlooks in its memorandum that Davis testified that " there was nothing hostile " in Goldsmith's manner. At the same time I do not wish either party or the learned court to believe that I am so guileless as to believe that one goes to a barber to have his teeth pulled, and the significance of this latter remark lies in the circumstance that the repetition of such " admonitions " might assume serious proportions. Davis also testified that on or about March twenty-sixth one Ben Kosher, another striker, told him (Davis) that some of the men wished to resort to " violent measures," but that the union was endeavoring to prevent such action and that, in fact, only a few of the men wished to resort to such measures. " He told me they were trying to hold it (violence) down."

(3) *As to Valentine.* Willard B. Valentine, a colored man, was employed as carpenter by plaintiff after the strike commenced. He testified that on March twenty-ninth he was stopped by a

striker, who said that if he continued to work he would go to the hospital and the man would go to jail, and that the strikers were willing to go to jail in order to fight for the success of the strike. Before me he testified that this was stated by one Goldsmith, the name having been given to him by Mr. Berg, but his affidavit accuses one Gilman of this remark. Gilman denies it. Subsequently Valentine claims he was stopped by some strikers and was told that if he continued to work they would beat him up. His affidavit states that these men said they would use "more drastic means." He got the names of these men by pointing them out to Shapiro, who in turn got them from Berg. The strikers deny making any such remarks, but they all admit that they stopped this witness and spoke to him about not taking the job. I agree that there can be no doubt that something was said between the strikers and Valentine, and as he was stopped and spoken to on two occasions it is at least doubtful whether the pickets were as "meek and humble" in their manner of speaking to Valentine on the second occasion as on the first. At the same time there was concededly no use of actual violence, and Valentine himself testified that what was said to him did not scare him and that "it did not amount to very much to me."

I find that the strikers stopped and spoke to Valentine on at least two occasions, and I further find that they told him to quit the job, but I refuse to find that they told him that they would beat him up or that they made any threats of a similar nature. On that point the evidence is too unconvincing, and Valentine's testimony is by no means satisfactory. I do not wish, however, to be misunderstood. I am quite aware that this strike was under the direction of one Max Wiener, who was indicted for the crime of assault in the second degree and pleaded guilty to assault in the third degree in the County Court of Bronx county, before Judge Gibbs, in connection with this union's strike in 1920, but there is nothing to show that in this particular strike there was any force or violence whatever directed by Wiener or his associates, much less any overt acts on their part, or that Mr. Wiener's conduct in the course of this strike was anything other than proper, lawful and orderly.

(4) *As to Porter.* The most serious alleged act of violence complained of in this entire matter is the act testified to by plaintiff's witness Porter, who was a machine hand before the strike, and is now a carpenter. He was employed by plaintiff several weeks before the strike. He testified that on April seventh he was beaten by four men near his home when he went out to purchase some food for breakfast for himself and family. Two of these men he claims to recognize as Goldsmith and Gilman,

being, he says, two of the strikers who called him " scab " on a previous occasion. On cross-examination, however, he stated that only one of the men who called him " scab " was in the party of four that assaulted him. His story of the alleged assault, it seems to me, was almost, though not completely, destroyed on cross-examination. He refused to swear positively. as to the identity of the men who assaulted him, and on this point plaintiff concedes, in its brief, " that no criminal action could be predicated upon such an identification." I do not think that Porter's testimony, read as a whole, shows that he was able to identify the individuals with sufficient clarity so as to declare who they were.

While it is not referred to in the brief of either learned counsel, it is significant that in Porter's affidavit, made for plaintiff, there is no mention of the names of those who thus are claimed to have assaulted him, though he stated before me that he gave the names of those he recognized to some lawyer or law clerk in Mr. Berg's office. Goldsmith and the other strikers deny the assault.

Mr. Berg himself never witnessed any such assault, and all his information in regard to it was hearsay.

As bearing further upon the improbability that Porter was assaulted in the manner claimed, it appears that, although he testified that he was rendered unconscious for several moments, he nevertheless went about his business after the alleged assault, bought rolls, etc., at the baker's for breakfast, went home and had his breakfast, said nothing to his wife about the alleged assault, and reached the shop at the regular hour for beginning work — eight A. M. Porter's testimony is vague and unsatisfactory, replete with contradictions, and I find that plaintiff failed to prove a case of assault upon Porter, and that, even if such an assault took place, there was no identification of any of the defendants in connection with it.

(5) *As to Greenstein.* The Greenstein incident amounts to very little, in my judgment. Greenstein claims in an affidavit that several of plaintiff's striking employees called upon him in order to induce him to see that his son should quit working for plaintiff. It is not denied that certain of the strikers called on Greenstein, but they state they made no threats and resorted to no intimidation whatever.

Mr. Greenstein was not called as a witness by plaintiff, nor was he subpœnaed. In my judgment, his affidavit should be entirely disregarded. Defendants surely were entitled to cross-examine. My experience in regard to the affidavits at the hearings held herein particularly convinces me of this, because there has developed the most substantial difference between some of the statements contained in the affidavits and the testimony as given under cross-examination by counsel and by myself at the hearings before me.

**4. As to the Preparation and Contents of the Affidavits Submitted upon the Motion.**

The affidavits on both sides, but of plaintiff in particular, were not prepared with care. There are numerous instances where facts were sworn to on knowledge which should only have been sworn to, if at all, on information and belief. The testimony of Miss Herschmann, the stenographer who transcribed plaintiff's affidavit, was evasive, and she was not frank, to use language of the utmost moderation. There are several instances of repudiated affidavits. After the strike was called two employees, one Sam Wolf and one Max Goldstein, made affidavits for plaintiff which they afterwards repudiated. I do not believe either Wolf or Goldstein, and place no faith in any of their statements, whether in affidavits or at the hearings before me. For example, Wolf testified that he did not know what he signed when he signed the affidavit for plaintiff, and denied the truth of all statements made in it. Yet it appeared very clearly that he could read and write, and understood English well, and knew what an affidavit was. My questioning developed this. In his subsequent affidavit, made for the defendant union, he testified that the acknowledgment was taken by a girl, when in fact it was taken by a man, as it appears from the affidavit itself. It is also significant that in his subsequent affidavit, made on defendants' behalf, he swore that he signed the original affidavit relying upon what Mr. Berg said to him, but upon cross-examination by me he admitted that Berg had said nothing to him before signing· this affidavit with respect to it. I am inclined to believe that Wolf knew what he was doing when he signed the affidavit for plaintiff. He was an intelligent witness, knew how to read and write, and the fact is that he remained at work after the other employees walked out and was friendly with Mr. Berg for several days after the walkout. I am, however, by no means convinced that what he stated in that affidavit was true and accurate. Nor am I convinced that what he stated in his subsequent affidavit on behalf of the defendants is true and accurate. Wolf is one of the type of witnesses only too frequent nowadays who disregards the sanctity of an oath and who permits himself to be swayed by the passion and prejudice of the moment. If such disregard for the sanctity of the oath continues to be manifested by witnesses of this type, American institutions themselves will be in danger. The same remarks apply, but with less force, to the respective affidavits of Max Goldstein. Witnesses of the type of Wolf and Goldstein blow hot one minute, they blow cold the next, and to find out whether the truth lies in their testimony or affidavits would tax the ingenuity of any one, for, as said by Judge Brian almost five centuries ago, "The devil himself knows not the

thought of such a man." *Anonymous*, reported in Year Book, 17 Edw. IV, 1, 2, decided by the Court of Common Pleas in 1477.

I do not believe either Wolf or Goldstein; I place no stock in the affidavits made by them for either party, and I have disregarded their testimony, pro or con, *in toto*.

### CONCLUSION.

There is one point, in conclusion, to which I respectfully desire to address the learned court's attention. The plaintiff is willing to have the question of wages and hours determined by arbitration, but refuses to recognize the union, and will not submit this issue to arbitration, insisting on its right to deal with its individual workers without the interposition of a third party. The defendants have been and are willing to submit all questions in dispute to arbitration and to abide by the result thereof.

I have mentioned this circumstance because counsel have requested me to do so in their briefs.

The labors of counsel before me have been earnest and honorable, despite the bitterness of this proceeding. There has been no unpleasantness or exhibition of temper or intolerance, despite the acrimony on the part of the respective clients. At the close of the last hearing there was a mutual interchange between the attorneys of expressions of mutual regard. I earnestly wish that their clients would act similarly and try to compose their differences amicably. As my friend, Judge Edgar J. Lauer, has well said: " Why not try conciliation? Life at best is a game of give and take. One never gains everything one seeks. Meet the other person half way."

If that course is not adopted, if plaintiff and defendants continue their industrial strife with each other, if labor and capital refuse to compose their differences, let them both beware. For we are told in Holy Writ: " *But if ye bite and devour one another, take heed that ye be not consumed one of another.*" Galatians, V, 15.

May I, therefore, earnestly request the learned counsel of both sides once again, for all of whom I entertain a sincere regard, to endeavor to compose amicably the differences between their clients? Thereby they will attain for their clients a real success, which will never be accomplished by fighting and by seeking to devour one another.