# State of New York
# Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 12
The People &c.,
        Respondent,
    v.
Santino Guerra,
        Appellant.

Kelly A. Librera, for appellant.
T. Charles Won, for respondent.

The order of the Appellate Division should be affirmed.

We are asked once again to discard the rule recognized in *People v Rodawald* (177 NY 408 [1904]) and *People v Miller* (39 NY2d 543 [1976]) that "preclud[es] the admission

- 1 -

of prior violent acts of victims in cases where a claim of justification is made" unless the defendant was aware of the specific acts at the time of the assault (*id*. at 553; *see People v Watson*, 20 NY3d 1018, 1020 [2013]; *Matter of Robert S.*, 52 NY2d 1046, 1048 [1981]). We decline to do so.

Defendant stabbed the victim in the chest with a small knife, causing life-threatening injuries. At trial, the court determined that defendant was entitled to raise a justification defense. Defendant sought to introduce evidence of the specific violent conduct underlying four of the victim's prior youthful offender adjudications to prove that the victim was the initial aggressor with respect to deadly physical force (*see People v Brown*, 33 NY3d 316, 321 [2019]). Supreme Court, in accordance with *Miller*, prohibited the jury from considering that evidence for that purpose. The Appellate Division affirmed (192 AD3d 563 [1st Dept 2021]).

"Youthful Offender status provides youth four key benefits: relief from [a] record of a criminal conviction, reduced sentences, privacy from public release of the youth's name pending the Youthful Offender determination on misdemeanor offenses only, and confidentiality of the Youthful Offender record" (Report of the Governor's Commission on Youth, Public Safety, and Justice 135 [2014]). Youthful offender designations are given to those who have "a real likelihood of turning their lives around," and the protection gives these individuals "the opportunity for a fresh start, without a criminal record" (*People v*

*Rudolph*, 21 NY3d 497, 501 [2013]).  Given these policy concerns, we see no reason to revisit the *Miller* rule in this case.[1]

Defendant's additional challenge to the constitutionality of the *Miller* rule is without merit (*see Williams v Lord*, 996 F2d 1481, 1483-1484 [2d Cir 1993]).

---

[1] The dissent incorrectly characterizes this appeal as limited to the propriety of the instruction admonishing the jury not to consider evidence of the victim's prior violent conduct for any non-impeachment purpose (dissenting op at 3).  However, the dissent's arguments make clear that the proposed rule would apply equally in murder cases (*see* dissenting op at 12) and therefore could not be limited to situations involving testimony by the victim.  A defendant accused of murdering a 17-year-old could, if the victim happened to have a prior Youthful Offender determination, offer direct evidence of specific conduct committed by the victim as a child to show the killing was justified.  Our exclusion of such evidence is neither "archaic," "obsolete," nor "out of step with other jurisdictions" (dissenting op at 8).  To the contrary, defendant seeks to offer evidence of prior bad acts that would not be admissible under the Federal Rules of Evidence or in nearly any state that has adopted those rules (*see* Federal Rule of Evidence 404 [a] [2]; McCormick on Evidence § 193 [8th ed 2022] [surveying various approaches]).

WILSON, J. (dissenting):

Imagine for a moment that you are a juror in a criminal case. On trial is a young man with no history of violence. He is charged with stabbing another young man, one who on four prior occasions has, without provocation, assaulted and beaten up strangers. The defendant says he stabbed the victim with a penknife attached to his keys because the other

man wielded a broken beer bottle as a weapon, hit him and was attempting to cut him with the beer bottle. The victim says he never had a beer bottle, never threatened the defendant, and it was the defendant who pulled out a knife and stabbed him following a minute of name-calling back and forth. As a juror, would you feel better able to determine who was the initial aggressor if you knew of the victim's history of violence, or would you be better able to determine the truth without any information about the victim's prior violent attacks? Under the doctrine the majority leaves in place today, no court can ever allow you to consider that information in deciding who was the initial aggressor.

Santino Guerra stabbed Dylan Pitt with a penknife, after a verbal altercation between strangers turned violent. Mr. Guerra claimed he was acting in self-defense, and the trial court concluded that he was entitled to an instruction as to justification, to which no challenge is made. It is the People's burden to prove lack of justification beyond a reasonable doubt. Included in that burden is the requirement that the People prove that Mr. Guerra, not Mr. Pitt, was the first aggressor. Certain evidence suggested that Mr. Guerra was the first aggressor; other evidence suggested that Mr. Pitt was. To assist the jury in determining that question, Mr. Guerra sought to introduce the facts underlying four of Mr. Pitt's prior arrests, each of which led to a criminal conviction replaced by a youthful offender adjudication. The trial court unsealed two of the youthful offender adjudications and permitted Mr. Guerra to introduce the facts concerning those two offenses, but issued a limiting instruction that the evidence could be used only for the purpose of evaluating Mr. Pitt's credibility and not to be considered in determining who was the initial aggressor.

The sole issue on this appeal is the propriety of the limiting instruction.[2] There is no challenge to the unsealing of the youthful offender records and no challenge to the presentation to the jury of the underlying facts of Mr. Pitt's violent acts leading up to those adjudications. The majority says, in essence, that we should uphold the limiting instruction to protect Mr. Pitt's confidentiality and give him a chance to turn his life around. Whatever force that position might have in a different case, it has none here, because that very evidence was exposed to the jurors (and anyone who attended the trial) in this case. Moreover, a defendant's right to put the People to their burden to prove guilt beyond a reasonable doubt—including proof that the defendant was the initial aggressor—is guaranteed by the U.S. Constitution. Mr. Pitt is not on trial; his statutorily protected interest in confidentiality pales in comparison and cannot be asserted to deprive Mr. Guerra of a fair trial.

I.

On St. Patrick's Day 2016, Santino Guerra, a twenty-year-old with no record of violent criminal behavior, encountered a group of four teenagers and young adults

---

[2] Mr. Guerra does challenge the trial court's failure to permit him to introduce evidence relating to two other sets of facts that led to another two other youthful offender adjudications for Mr. Pitt. However, as to all admissible evidence, trial courts are vested with great authority to manage trials by precluding evidence as cumulative so as to not bog down trials (*see People v Ely*, 68 NY2d 520, 532 [1986]). It was well within the trial court's discretion to allow introduction of two, but not four, of Mr. Pitt's prior violent incidents.

including Dylan Pitt, who had several youthful offender adjudications for violent assaults. Both Mr. Guerra and Mr. Pitt had been drinking.

Mr. Guerra had an ugly-looking black eye from an assault he suffered a few days before his foray to Van Cortlandt Park to watch the St. Patrick's Day parade. As he and Mr. Pitt's group passed each other, one of Mr. Pitt's friends harangued Mr. Guerra about his black eye. A series of verbal jabs turned into physical jabs, though with inconsistent evidence about whether Mr. Pitt wielded a beer bottle as a weapon, swung with it or his fist, or made contact with Mr. Guerra's person. Some evidence suggested that Mr. Pitt first threatened deadly force; other evidence suggested that he did not.

Mr. Guerra was tried to a jury for assault in the second degree (Penal Law § 120.05) and asserted a justification defense (*see* Penal Law § 35.15 [2] [a]), claiming that he "reasonably believe[d] that [Mr. Pitt was] using or about to use deadly physical force." To support his defense, Mr. Guerra sought to question Mr. Pitt about four previous incidents in which Mr. Pitt had attacked or threatened another person, including a previous St. Patrick's Day altercation. Mr. Guerra explained that those prior incidents were relevant as part of the evidence the jury should be able to rely on to determine whether he or Mr. Pitt first threatened deadly force. In all four of the cases Mr. Guerra sought to introduce, Mr. Pitt was adjudicated a youthful offender, meaning that, pursuant to CPL 720.20, his four criminal convictions in those cases were converted to youthful offender findings and the related records were sealed pursuant to CPL 720.35 (2). Mr. Guerra learned about those incidents only because the trial judge had specifically unsealed them for the purposes of this case. The court allowed Mr. Guerra to cross-examine Mr. Pitt about two of those

incidents, but only to establish that Mr. Pitt had a motive to lie because he was on probation for the two previous incidents—under our present rule as set forth in *People v Miller*, evidence of similar prior bad acts generally can be introduced only if the defendant knew of them prior to the time of the charged crime or, if unknown to the defendant, the bad acts consisted of threats against the defendant (39 NY2d 543, 549, 551 [1976]). At trial, the court said that the questioning about the prior incidents "goes only toward the issue of whether or not Mr. Pitt has a motive to lie and on the issue of his credibility and not for any other purpose." Before the jury began its deliberations, the court additionally informed them that "a person cannot be considered the initial aggressor simply because he has previously engaged in violent acts."

The jury found Mr. Guerra guilty and he was sentenced to three years' incarceration. The Appellate Division affirmed Supreme Court's order convicting Mr. Guerra upon a jury verdict and rejected Mr. Guerra's challenge to Supreme Court's refusal to permit the challenged evidence on *Miller* grounds, reasoning that "[s]ince the acts were unknown to defendant, they were irrelevant to his state of mind at the time of the altercation and cannot establish that the victim was the initial aggressor" (192 AD3d 563, 564 [1st Dept 2021]).

Mr. Guerra urges us to modify the *Miller* rule. Doing so would render the limiting instruction erroneous, and Mr. Guerra would be entitled to a new trial in which he could argue that Mr. Pitt's prior violent acts supported the conclusion that Mr. Pitt, not Mr. Guerra, was the first to threaten deadly force. As we commented in *Miller* itself, our existing rule was not then accepted by most state courts or the federal courts (39 NY2d at 549). In the ensuing decades, the balance has tipped even further against our existing rule.

Although the majority "see[s] no reason to revisit the *Miller* rule" due to the "policy concerns" raised by the way Mr. Guerra sought to use the particular evidence in this case (majority op at 3), those concerns do not justify a misguided and obsolete rule.

II.

Under Penal Law § 35.15 (2) (a), a defendant is typically justified in using deadly physical force on another person when the defendant "reasonably believes that such other person is using or about to use deadly physical force," where "deadly physical force" is defined as "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury" (Penal Law § 10.00 [11]). Most defendants cannot succeed on that defense if they are the "initial aggressor[s]" in a confrontation (Penal Law § 35.15 [1] [b]; *see People v Petty*, 7 NY3d 277, 285 [2006]; *Stokes v People*, 53 NY 164, 174-175 [1873]).

Although the general principles of consistency, integrity, and humility underlying *stare decisis* are always relevant when we decide cases (*see generally State v Donald DD.*, 24 NY3d 174, 187 [2014]), *stare decisis* "[c]onsiderations . . . are at their [weakest] . . . in cases . . . involving procedural and evidentiary rules" (*Payne v Tennessee*, 501 US 808, 828 [1991]). Not only do common-law evidentiary rules entail relatively limited reliance interests (*id.*; *see also People v Turner*, 117 NY 227, 233 [1889]), but litigants are on notice that "[t]he common law of evidence is constantly being refashioned by the courts of this and other jurisdictions to meet the demands of modern litigation" (*see Brown v Ristich*, 36 NY2d 183, 190 [1975]). That is, neither Mr. Guerra nor Mr. Pitt considered or in any way relied on our *Miller* rule when deciding how to conduct themselves on St. Patrick's Day,

and few if any future combatants with long criminal records are depending on the

continuation of our existing rule to help tip the first aggressor balance in their favor.

The relatively light weight of *stare decisis* here is evident from the changes to our

rule over time.  Beginning with *People v Lamb*, we announced that character evidence of

a victim is inadmissible "as a general principle" but further explained that "when

admissible, it must be in a case where the defendant had reason to be in fear of his life, or

had reasonable grounds to apprehend great bodily harm" (2 Abb Prac [NS] 148, 154 [NY

1866]).  Applying that rule in *Lamb*, we concluded that the trial court properly excluded

the testimony of a third party that the decedent had thrown a pot lid at a door as her husband

left through it, as proof that he had any reason to fear great bodily harm when he returned

15 minutes later and killed her (*see* 2 Abb Prac [NS] at 160).  Seven years later, in *Stokes

v People*, we modified the rule in *Lamb*, permitting evidence of threats made by the victim

against the defendant even where the defendant did not know of them because "threats

indicate an intention to do it, and the existence of this intention creates a probability that

he has in fact committed it" (53 NY 164, 175 [1873]).

By *People v Druse*, we had crystalized a new rule that held for the next few decades,

stating

> "[t]he rule is that, after evidence has been given by a defendant
> tending to show that the homicide was committed in self-
> defense, he may follow it by proof of the general reputation of
> the deceased for quarrelsomeness and violence. But a
> defendant is confined to proof of general reputation, and
> evidence of specific acts of violence towards third persons is
> inadmissible"

(103 NY 655, 655 [1886]; *accord People v Gaimari*, 176 NY 84, 95 [1903]).  In *People v Rodawald*, we revisited the doctrine once more, noting that "[u]pon a trial for murder . . . the accused . . . may prove that the general reputation of the deceased was that of a quarrelsome, vindictive or violent man and that such reputation had come to his knowledge prior to the homicide" (177 NY 408, 423 [1904]).  We added a further restriction: "[s]uch evidence is not received to show that the deceased was the aggressor," (*id.*) notwithstanding the fact that unknown threats were still permissible evidence (*id.*, citing *Stokes*, 53 NY at 174).

We announced our most recent modification of this doctrine in *People v Miller*.  To sustain his justification instruction, Mr. Miller attempted to introduce prior incidents and evidence of his sister's erratic and sometimes violent behavior.  We held that

> "the [*Rodawald*] rule should be modified to permit a defendant in a criminal case, where justification is an issue, to introduce evidence of the victim's prior specific acts of violence of which the defendant had knowledge, provided that the acts sought to be established are reasonably related to the crime of which the defendant stands charged."

(39 NY2d at 551).  *Miller* contains no discussion of the weight of *stare decisis*, evidencing by its silence our recognition that *stare decisis* has little or no weight in this particular area.  Much as *stare decisis* did not factor into our decision in *Miller* to modify the *Rodawald* rule, it does not preclude us from modifying the rule in *Miller*.

By contrast, subsequent developments have made *Miller* an increasingly "archaic and obsolete doctrine" that is out of step with other jurisdictions (*cf. People v Peque*, 22 NY3d 168, 194 [2013] [discussing a condition for departing from precedent in general]).

Although New York may choose to disregard the evidentiary or procedural rules of the federal courts or our sister states, we are mindful of the "persuasive force" of other jurisdictions (*cf. Costello on Behalf of Stark v Geiser*, 85 NY2d 103, 110-111 [1995]). Indeed, we have always been attentive to other states' practice when articulating our doctrine on this question (*see, e.g. Lamb*, 2 Abb Prac [NS] at 154-155; *Miller*, 39 NY2d at 549-550). New York's embrace of what we, in *Miller*, called "the traditional rule" (39 NY2d at 549) is increasingly out of the mainstream. Even when we announced the *Miller* rule, we noted that "the trend of the decisions in other jurisdictions, even in certain jurisdictions which formerly denied the admissibility of testimony as to specific acts, is towards the admissibility of such evidence" (*id*.). Since *Miller*, that trend has continued, as many of the states that "adhered to the rule of exclusion" (*id*. at 549 n 2) have either abandoned it or else never fully excluded all evidence of a victim's character on the first aggressor question (*compare id. with State v Dunson*, 433 NW2d 676, 680 [Iowa 1988], overruled with respect to specific acts evidence *State v Williams*, 929 NW2d 621, 636 [Iowa 2019]; *Com. v Davis*, 14 SW3d 9, 14 [1999]; *State v Lee*, 331 So2d 455, 460 [La 1975]; *Thomas v State*, 301 Md 294, 307 [1984]; *State v Keaton*, 258 Minn 359, 367 [1960]; *State v Gonzales*, 153 SW3d 311, 313 [Mo 2005]; *State v Lewchuk*, 4 Neb App 165, 172-174 [1995]). Today, it is "well established" in most jurisdictions that a defendant may use some sort of character evidence—even if unknown to the defendant at the time—to argue that the victim was the first aggressor (*see* McCormick on Evidence § 193 [8th ed 2022]; *Commonwealth v Adjutant*, 443 Mass 649, 655 [2005] ["appellate courts in forty-five of the forty-eight State jurisdictions that have considered the issue have decided that some

form of such evidence is properly admissible on the first aggressor issue, regardless whether the victim's violent character was known to the defendant at the time of the assault"]).  Although other jurisdictions do not all adopt the same rule, today, New York appears to stand almost alone in embracing "rule of exclusion" (*Miller*, 39 NY2d at 549 n 2), save for Maine (*see State v Leone*, 581 A2d 394, 400 [1990]).

### III.

Innocent people go to prison and guilty people go free when we exclude relevant evidence.  Our blanket prohibition on using *any* evidence of the victim's character or prior bad acts in considering a dispute as to who was the first aggressor undermines our "truth-seeking function" by barring the consideration of facts relevant to a material issue (*see Bill Birds, Inc. v Stein Law Firm, P.C.*, 35 NY3d 173, 178 [2020]).  Excluding that evidence is especially concerning because it offends "our basic philosophic belief that in criminal cases there is to be greater latitude in admitting exculpatory evidence than in determining whether prejudicial potentialities in proof offered to show guilt should result in its exclusion" (*Matter of Robert S.*, 52 NY2d at 1053 [Fuchsberg, J., dissenting] [citing 1 Wigmore, Evidence, § 194]).  Given its potential to obscure the truth, the *Miller* rule has been sharply criticized (*see, e.g. Robert S.*, 52 NY2d at 1052 [Fuchsberg, J., dissenting]; *Williams v Lord*, 996 F2d 1481, 1485 [2d Cir 1993] [Cardamone, J., concurring]).

The exclusionary rule articulated in *Rodawald* and *Miller* has been justified on three bases, none of which is consistent with the truth-seeking function of courts nor our rules governing propensity evidence generally.  The primary rationale has been that "the worst man has the right to live the same as the best, and no one may attack another because his

general reputation is bad" (*Rodawald*, 177 NY at 422).  The second reason, articulated most clearly in *Miller*, "is the need to carefully limit and narrow the issues that the jury must decide" (39 NY2d at 551; *see also Rodawald*, 177 NY at 424).  *Miller* and *Rodawald* also suggest a third reason, similar to the second but relating only to the admission of specific acts as opposed to general reputation: "[g]enerally, character and reputation may not be proved by reference to specific acts, except to impeach the credibility of character witnesses" (*Miller*, 39 NY2d at 551; *Rodawald*, 177 NY at 424).

The first rationale functionally extends our evidentiary doctrine in *Molineaux* beyond its jurisprudential foundations.  In brief, our *Molineaux* rule prevents the prosecution from using evidence that a defendant has committed past crimes or bad acts to prove that the defendant probably committed the charged crime.  We explained that our exclusion of such evidence was "the product of that same humane and enlightened public spirit which . . . has decreed that every person charged with the commission of a crime shall be protected by the presumption of innocence until he has been proven guilty beyond a reasonable doubt" (168 NY 264, 291 [1901]): introducing evidence of past bad acts "would lead to convictions, upon the particular charge made, by proof of other acts in no way connected with it, and to uniting evidence of several offenses to produce conviction for a single one" (*id*. at 292 [quoting *Coleman v People*, 55 NY 81, 90 [1873]; *accord People v Jackson*, 39 NY2d 64, 68 [1976] ["The danger that a jury might condemn a defendant because of his past criminal activity rather than his present guilt has been propounded as justification for the exclusion"]).

By contrast, in civil law, liability is often proved by propensity evidence.[3]  In the criminal context, we generally break from our norm of permitting past conduct to demonstrate a propensity in order to protect the presumption of innocence and high bar of proof beyond a reasonable doubt—not because such evidence has no probative value.  But neither the *Molineaux* rule nor its underlying purpose has any application to the use of prior bad acts of the complainant, who is not entitled to the same procedural protections as criminal defendants because the state is not criminally prosecuting the complainant.

Adapting our law to conform to the general approach in almost all other jurisdictions would not impinge on the reasons for eschewing propensity evidence to prove guilt.  A modified rule would apply only in cases where a defendant was entitled to a justification charge, and only in the subset of those cases in which first aggressor status was disputed.  In such cases, allowing a defendant to introduce exculpatory propensity evidence (whether reputational or specific relevant bad acts) poses no risk to erosion of the presumption of innocence or weakening of the burden to prove guilt beyond a reasonable doubt; those protections, after all, belong to the defendant.  Nor would a modified rule harm victims of

---

[3] For example, courts regularly consider propensity evidence about the defendant and third parties in cases involving negligent entrustment (*see, e.g. Hamilton v Beretta U.S.A. Corp.*, 96 NY2d 222, 237 [2001]), negligent hiring (*see e.g. Waterbury v New York City Ballet, Inc.*, 205 AD3d 154, 160 [1st Dept 2022]; *Novak v Sisters of Heart of Mary*, 210 AD3d 1104, 1105 [2d Dept 2022]), discrimination claims (*see e.g.*, *Robinson v Metro-North Commuter R.R. Co.*, 267 F3d 147, 158 [2d Cir 2001]; *New York City Bd. of Ed., Community School Dist. No. 1 v Batista*, 54 NY2d 379, 382-384; *Fern v International Business Machines Corp.*, 204 AD2d 907, 908-909 [3d Dept 1994]), and fraud or theft claims (*see e.g. Andryeyeva v New York Health Care, Inc.*, 33 NY3d 152, 171 [2019]; *Rocanova v Equitable Life Assur. Soc. of U.S.*, 83 NY2d 603, 611 [1994]).

crimes by introducing needlessly prejudicial evidence (*see e.g. People v Watson*, 20 NY3d 1018, 1020 [2013] [excluding propensity evidence because the victim could not have been the initial aggressor, "no matter how great his propensity for violence, for the simple reason that (he) did not have a gun"]).

The second and third rationales are largely undercut by *Miller* itself. There, we altered the rule in *Rodawald* by allowing the introduction of specific violent acts known to the defendant, even if those violent acts were not directed at the defendant. In permitting the admission of such evidence, though "mindful of the danger that the principal issues to be resolved may be lost in an endless maze of collateral matters," we resolved that concern by noting that questions of relatedness and extent of the proof would be sufficiently constrained by the trial court's "exercise of its sound discretion" to exclude prejudicial, cumulative, or collateral evidence (*see Miller*, 39 NY2d at 552). Having concluded that trial courts are fully capable of regulating violent acts about which the defendant knew so as to avoid unfairness to victims and miring juries in irrelevant mini trials, it is difficult to conclude that trial courts would be incapable of doing the same for prior violent acts unknown to defendants. Meanwhile, by reaffirming *Stokes*, *Miller* also allowed a defendant to prove a complainant's violent propensity by prior acts (namely, prior threats made by a complainant, even when unknown to the defendant), a decision at some tension with its third rationale (*see Miller*, 39 NY2d at 549).

The *Miller* restriction puts juries like the one here in a peculiar position. On the one hand, if, prior to their altercation, Mr. Guerra happened to see reports of Mr. Pitt's prior

bad acts in the news, or heard about them from neighbors, the jury could hear evidence of those bad acts to help decide whether Mr. Guerra was justified in stabbing the complainant. On the other hand, we say that the jury may not make that same deduction when deciding who it thought started the fight. In deciding the first aggressor question, the jury was—because of the *Miller* rule—admonished that it must not prejudge the complainant based on his prior St. Patrick's Day brawl. The *Miller* rule defies common sense and is out of line with much of the rest of our evidentiary law. We should update it, much as *Miller* updated the antiquated regime of *Rodawald*.

The majority posits that because some jurisdictions permit the introduction of reputation when determining who was the first aggressor but forbid introduction of specific bad acts, the result here might be the same were we to modify *Miller* and adopt such a rule (*see* majority op at 3 n; *U.S. v Smith*, 230 F3d 300, 308 [7th Cir 2000] ["character evidence usually does not go to an essential element of a self-defense claim," meaning specific acts evidence is typically inadmissible under Federal Rule of Evidence 405 (b)]). That is true. However, the possibility that we might modify *Miller* and adopt a rule precluding bad acts but allowing bad reputation is not a defense of the *Miller* rule any more than it is a defense of a rule never permitting a defendant to introduce any evidence at all—a rule that would also result in the same outcome in this case.

IV.

The "policy concerns" (majority op at 3) referenced by the majority should not prevent us from revisiting this doctrine in this case. Applying a revised rule would not have

resulted in any additional harm to Mr. Pitt.  Supreme Court independently decided to unseal Mr. Pitt's youthful offender records and permitted Mr. Guerra to ask Mr. Pitt about two of the convictions for the purpose of indicting his credibility.  Under the Confrontation Clause of the Sixth Amendment to the US Constitution, Supreme Court was required to permit Mr. Guerra to ask Mr. Pitt about those convictions (*see Davis v Alaska*, 415 US 308, 319 [1974]).  The only question facing Supreme Court with respect to these two adjudications was whether it should permit Mr. Guerra to use them as evidence about who was the first aggressor (it did not) and whether it should issue a limiting instruction to the jury admonishing them only to consider the convictions for the purpose of Mr. Pitt's credibility (it did).  As for the two wholly excluded offenses, Supreme Court would be free at a retrial to continue to exclude all evidence about them. Modifying *Miller* as Mr. Guerra requests would not require the court divulge any new information about Mr. Pitt's prior bad acts.

It is beyond question—and indeed, no one disputes—that Mr. Guerra was entitled to a justification instruction and that the burden to disprove his defense was on the prosecution (*see People v Umali*, 10 NY3d 417, 425 [2008]; *People v Maher*, 79 NY2d 978, 982 [1992]).  Much as Mr. Guerra's right to a complete defense entitled him to introduce Mr. Pitt's convictions to indict his credibility, it also entitled Mr. Guerra to use that already-introduced evidence to support his justification defense.  "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment . . .  the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense' " (*Crane v Kentucky*,

476 US 683, 690 [1986] [quoting *California v Trombetta*, 467 US 479, 485 (1984)]).  The majority defends this application of the *Miller* rule by citing nonbinding case law (*see* majority op at 3), which merely repeated two of the weak justifications for *Miller* and then noted that the evidence in question "ha[d] little probative value" because the victim's alleged prior bad act did not result in a prosecution or conviction and was insufficiently similar to the crime at issue (*Williams v Lord*, 996 F2d 1481, 1483-1484 (2d Cir 1993)]).  Here, unlike in *Williams*, the facts leading to Mr. Pitt's multiple previous assault adjudications bear a striking resemblance to his St. Patrick's Day altercation with Mr. Guerra: indeed, one such adjudication stemmed from Mr. Pitt's assault of a stranger on St. Patrick's Day three years prior.

The majority counters not so much by defending the court's conduct in this case—which involves a limiting instruction on already-introduced evidence—but in imagining a hypothetical case in which some rule one might extract from the dissent were applied differently to an incomplete set of facts (*see* majority op at 3 n).  I would "reject the hypothetical on threshold grounds" (*see* Paul Gewirtz, *The Jurisprudence of Hypotheticals*, 32 J Legal Educ 120, 121 [1982]).  The majority speculates that a defendant accused of murdering a 17-year-old victim might offer direct evidence of a prior youthful offense to show the killing was justified (majority op at 3 n), "but one cannot simply *assume* that the checks [in the system] fail" (Gewirtz at 121).  In the majority's hypothetical, a trial judge would have found the evidence relevant, insufficiently prejudicial, and noncumulative at the very least, and a jury would weigh it along with all other relevant evidence.  Suppose—

to alter the majority's hypothetical a bit—the 17-year-old victim had several youthful offender adjudications resulting from attempted knifepoint robberies over the past year in the exact location where the killing took place and was found shot by the defendant, knife in hand. Surely in such a context the previous attempted robberies would help a jury decide whether the defendant was the first aggressor. Although hypotheticals can help us think more clearly and design better rules (*see id.* at 120-121), the majority's textureless hypothetical does not help us grapple with the limiting instruction at issue in this case.

The limiting instruction here, which prevented the jury from considering Mr. Pitt's past acts as evidence suggesting that he was the initial aggressor, does not serve the purpose of the youthful offender laws because Mr. Pitt's past acts were already revealed to the jury. Moreover, Mr. Guerra, not Mr. Pitt, was on trial. Mr. Guerra's right to a complete defense required the trial court to permit the jury to consider Mr. Pitt's prior similar violent acts as part of the evidence bearing on which of the two was the first aggressor. Whatever the rule might be in a case in which the victim's past acts were wholly obscured from the jury by virtue of a youthful offender adjudication, this is not that case. Accordingly, I dissent and would remit for a new trial.

Order affirmed, in a memorandum. Acting Chief Judge Cannataro and Judges Garcia, Singas and Troutman concur. Judge Wilson dissents in an opinion, in which Judge Rivera concurs.

Decided March 16, 2023